**OUTTEN & GOLDEN LLP**
Adam T. Klein (AK 3293)
Piper Hoffman (PH 4990)
Cara E. Greene (CG 0722)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Fax: (212) 977-4005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUSAN DULING and MARGARET ANDERSON,
on behalf of themselves
and all others similarly situated,

               Plaintiffs,          **06 CV 10197 (LTS)(HBP)**

     -against-

GRISTEDE'S OPERATING CORP.; RED APPLE
GROUP, INC., D/B/A GRISTEDE'S; GRISTEDE'S
FOOD INC.; GRISTEDE'S DELIVERY SERVICE, INC.;
GRISTEDE'S FOODS NY, INC.; GRISTEDE'S NY, LLC;
and NAMDOR, INC.;

               Defendants.

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 2

   I. Gristede's Stores Follow a Standardized Hierarchical Structure and Uniform
      Operations that are Centrally Promulgated by Corporate Management. ........................... 2

   II. Gristede's Has Uniform Personnel and Promotion Policies Across Stores. ........................ 3

     A. Gristede's Has Common Practices and Policies for Hiring New Employees. .............. 4

     B. Gristede's Gives Hiring Personnel Broad Discretion But No Guidance on How to
        Exercise It. ..................................................................................................... 4

     C. Gristede's Relies on Managers' Subjective and Discretionary Promotion
        Recommendations, but Provides No Guidance on How to Make
        Recommendations. .......................................................................................... 5

   III. Gristede's Does Not Monitor Its Hiring and Promotion Policies and Practices to
       Ensure that They Are Non-Discriminatory. ......................................................... 7

   IV. Statistical Analysis Shows Gender Discrimination at Gristede's. ..................................... 8

   V. Gristede's Personnel Practices and Policies Lack Mechanisms Known to Minimize
      Workplace Bias. ............................................................................................. 10

   VI. Anecdotal Evidence from Plaintiffs and Other Employees Further Demonstrates Gender
       Discrimination at Gristede's. ........................................................................... 13

ARGUMENT ....................................................................................................... 14

   I. Federal Courts Routinely Certify Gender Discrimination Claims that Challenge
      Subjective Decision-Making Practices and Procedures. ............................................. 14

   II. Evidence Supports Certification of Plaintiffs' Claims under the Second Circuit's *IPO*
      Framework. .................................................................................................. 15

   III. The Evidence Supports Class Certification ................................................................... 16

     A. Plaintiffs Meet the Requirements of Federal Rule of Civil Procedure 23(a). .............. 17

        1. The Proposed Class is Sufficiently Numerous and Joinder of All Members is
           Impracticable. ............................................................................................. 17

2. The Class Claims Present Many Common Issues of Law and Fact. ...................... 18

3. The Proposed Plaintiffs' Claims are Typical of Those of the Class. ..................... 20

4. The Plaintiffs Will Fairly and Adequately Protect the Interests of the Class. ........ 21

B. Plaintiffs Meet the Standard for Class Action Certification under Rule
23(b)(2). ....................................................................................................................... 22

C. Outten & Golden LLP Should Be Appointed Class Counsel Pursuant to
Rule 23(g). ................................................................................................................... 25

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ....................................................................................................22

*Ansoumana v. Gristede's Operating Corp.,*
    201 F.R.D. 81, 87 (S.D.N.Y. 2001)...........................................................................22

*Baffa v. Donaldson,*
    222 F.3d 52 (2d Cir. 2000) ........................................................................................21

*Barone v. Safeway Steel Prods., Inc.,*
    Civ. 4258, 2005 U.S. Dist. LEXIS 17645 (E.D.N.Y. Aug. 23, 2005) ....................21

*Beckmann v. CBS, Inc.,*
    192 F.R.D. 608 (D. Minn. 2000) ...............................................................................14

*Brown v. Kelly,*
    244 F.R.D. 222 (S.D.N.Y. 2007).............................................................................18

*Butler v. Home Depot, Inc.,*
    No. C-94-4335 SI, 1996 U.S. Dist. LEXIS 3370 (N.D. Cal. Jan. 24, 1996) ...........20

*Butler v. Home Depot, Inc.,*
    No. C-94-4335 SI, 1997 U.S. Dist. LEXIS 16296 (N.D. Cal. Aug. 28, 1997).........15

*Caridad v. Metropolitan-N. Commuter R.R. Co.,*
    191 F.3d 283 (2d Cir. 1999) ............................................................................15, 18, 20

*Castaneda v. Partida,*
    430 U.S. 482 (1977) ......................................................................................................9

*Cokely v. N.Y. Convention Ctr. Oper. Corp.,*
    Civ. 4637 (CBM), 2004 U.S. Dist. LEXIS 9264 (S.D.N.Y. May 21, 2004)........18, 22, 23, 25

*Cortigiano v. Oceanview Manor Home,*
    227 F.R.D. 194 (E.D.N.Y. 2005) ..............................................................................18

*DeMarco v. Robertson Stephens Inc.,*
    228 F.R.D. 468 (S.D.N.Y. 2005)...............................................................................16

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) .......................................................................................22

*Deposit Guaranty National Bank v. Roper,*
    445 U.S. 326 (1980) ................................................................................18

*Dukes v. Wal-Mart, Inc.,*
    509 F.3d 1168 (9th Cir. 2007) .................................................................15

*Dukes v. Wal-Mart Stores,*
    222 F.R.D. 137 (N.D. Cal. 2004) ............................................................20

*Dura-Bilt Corp. v. Chase Manhattan Corp.,*
    89 F.R.D. 87 (S.D.N.Y. 1981) .................................................................21

*E. Tex. Motor Freight System, Inc. v. Rodriguez,*
    421 U.S. 395 (1977) ................................................................................14

*Ellis v. Costco Wholesale Corp.,*
    240 F.R.D. 627 (N.D. Cal. 2007) ............................................................15

*General Telephone & Telegraph Southwest v. Falcon,*
    457 U.S. 147 (1982) ..................................................................14, 19, 20

*Hnot v. Willis Group Holdings,*
    228 F.R.D. 476 (S.D.N.Y. 2005) ...........................15, 16, 19, 23, 25

*Hnot v. Willis Group Holdings,*
    241 F.R.D. 204 (S.D.N.Y. 2007) ..............................................16, 20, 23

*In re Initial Public Offering Securities Litigation,*
    471 F.3d 24 (2d Cir. 2006) ................................................................15, 16

*Jenkins v. Raymark Industrial, Inc.,*
    782 F.2d 468 (5th Cir. 1986) ...................................................................18

*Latino Officers' Association of N.Y. v. City of New York,*
    209 F.R.D. 79 (S.D.N.Y. 2002) ........................................................ passim

*Lee v. ABC Carpet & Home,*
    236 F.R.D. 193 (S.D.N.Y. 2006) .............................................................16

*Malave v. Potter,*
    320 F.3d 321 (2d Cir. 2003) ......................................................................9

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ...............................................................16, 18

*McBean v. City of New York*,
  228 F.R.D. 487 (S.D.N.Y. 2005)..................................................................................16

*McReynolds v. Sodexho Marriott Services*,
  208 F.R.D. 428 (D.D.C. 2002) ...................................................................................15

*Ottaviani v. State University of N.Y.*,
  875 F.2d 365 (2d Cir. 1989) .........................................................................................9

*In re Parmalat Secs. Litig.*,
  Civ. 0030, 2008 U.S. Dist. LEXIS 64296 (S.D.N.Y. Aug. 20, 2008)....................17

*Parker v. Time Warner Entertainment Co.*,
  331 F.3d 13 (2d Cir. 2003) .........................................................................................23

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)........................................................................................17

*Robinson v. Metropolitan-N. Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001)...........................................................................15, 18, 23

*Shores v. Publix Super Mkts.*,
  95-1162-C 1996 U.S. Dist. LEXIS 3381 (M.D. Fla. Mar. 12, 1996) ......................15

*Smith v. Nike Retail Services, Inc.*,
  234 F.R.D. 648 (N.D. Ill. 2006)..................................................................................15

*Smith v. Xerox Corp.*,
  196 F.3d 358 (2d Cir. 1999)..........................................................................................9

*Stender v. Lucky Stores, Inc.*,
  803 F. Supp. 259 (N.D. Cal. 1992) .............................................................................15

*Stender v. Lucky Stores, Inc.*,
  Number C 88-1467, 1990 U.S. Dist. LEXIS 19985 (N.D. Cal. June 8, 1990) ........20

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
  No. 06-3794-cv, 2008 U.S. App. LEXIS 21498 (2d Cir. Oct. 14, 2008) ................15

*Trief v. Dun & Bradstreet Corp.*,
  144 F.R.D. 193 (S.D.N.Y. 1992) ................................................................................18

*Velez v. Novartis Corp.*,
  244 F.R.D. 243 (S.D.N.Y. 2007) .............................................................15, 20, 23, 25

*Vengurlekar v. HSBC Bank,,*
  No. 03 CV 0243, 2007 U.S. Dist. LEXIS 37521 (S.D.N.Y. May 22, 2007) ...............18, 20, 22

*Waisome v. Port Authority of N.Y. & N.J.,*
  948 F.2d 1370 (2d Cir. 1991)...................................................................................................9

*Warren v. Xerox Corp.,*
  01-C 2004 U.S. Dist. LEXIS 5115 (E.D.N.Y. Jan. 26, 2004) ...........................................15, 19

*Watson v. Fort Worth Bank of Trust Co.,*
  487 U.S. 977 (1988)................................................................................................................14

**STATUTES**

Fed. R. Civ. P. 23(b)(2)....................................................................................................... passim

## PRELIMINARY STATEMENT

This case presents classic examples of gender segregation in job assignments and a glass ceiling in promotions – precisely the types of claims for which the class action device was created. Named Plaintiffs Susan Duling and Margaret Anderson ("Plaintiffs") brought this class action to challenge company-wide discrimination at Defendants' Gristede's grocery stores that has resulted in the concentration of women workers in lower-level and lesser-paying positions.

Gristede's standard operating procedure has been to deny female workers pay and opportunities for advancement on par with those it provides to men. At the hiring stage, Gristede's steers female employees into entry level positions from which it rarely makes promotions. Thereafter, Gristede's further discriminate against female workers by denying them promotional opportunities by relying on an informal and discretionary "tap on the shoulder" system to fill more senior positions. Gristede's makes hiring and promotion decisions without reference to any formal criteria, based exclusively on subjective evaluations made by untrained managers. This system of unfettered managerial discretion, unguided subjective reviews, and closed-door selections has resulted in pervasive discrimination against female employees.

Through this motion under Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiffs seek certification of a class defined as: all current and former female Gristede's employees who worked for Gristede's at any time between November 2, 2004 and the date of final judgment in this matter (the "class period"). Plaintiffs ask the Court to (a) appoint them as class representatives and appoint Outten & Golden LLP, Plaintiffs' counsel of record, as class counsel, and (b) approve the proposed notice (Exhibit 32) about this action for dissemination to the class.

In seeking class certification, Plaintiffs rely upon their Amended Complaint, their sworn declarations and deposition testimony, sworn declarations from other Gristede's employees, documents produced in discovery, deposition testimony of Gristede's managers, and the reports

of Plaintiffs' statistical expert Dr. David L. Crawford ("Crawford" and "Crawford Rebuttal") and sociological expert Dr. William Bielby ("Bielby").[1] With this evidence, Plaintiffs will show that the putative class satisfies all the requirements of Rule 23(a), and that certification under 23(b)(2) is warranted because Gristede's impacted the entire class through a company-wide pattern or practice of gender discrimination and failure to take any remedial action.

## STATEMENT OF FACTS

### I. Gristede's Stores Follow a Standardized Hierarchical Structure and Uniform Operations that are Centrally Promulgated by Corporate Management.

Gristede's is a regional grocery chain with more than 1,800 employees.[2] The company is hierarchical, with top management at its main office at 823 11th Avenue, New York City ("Main Office"). McCormick Tr. 16:11-12. At the bottom of the hierarchy are non-supervisory workers at forty grocery stores in and around New York City. The stores are organized into two Districts: District 1 is overseen by District Manager Christopher Lang, and District 2 is overseen by District Manager James Monos. *Id.* at 22:14-23:3. Lang and Monos report to Charles Criscuolo, Senior Executive Vice-President, and Carmen Napolitano, Vice-President of Operations.[3] Each store is organized into departments that are overseen on a company-wide basis by approximately ten department supervisors who report to Criscuolo. Eight of the ten department supervisors are men. McCormick Tr. 89:9-90:3, 90:19-92:13. Criscuolo reports to John Catsimatidis, owner and President of the company. Criscuolo Tr. 25:11-16, 38:19-22.

Every Gristede's store has the same management structure. Each store has a store manager who reports to a District Manager. *Id.* at 15:20-22; McCormick Tr. 25:4-14. Store managers are

---

[1] These materials are included as Exhibits 1 through 33 to the Declaration of Piper Hoffman in Support of Motion for Class Certification ("Hoffman Dec."). Excerpts from deposition transcripts and declarations are cited to herein using the witness's last name (e.g., "LAST NAME Tr." and "LAST NAME ¶").

[2] McCormick Tr. 23:12-15; Criscuolo Tr. 53:18-20.

[3] Monos Tr. 35:19-36:2; Lang Tr. 28:21-29:6.

responsible for overseeing the general operations of their stores.[4]  Most stores also have one or

more assistant managers,[5] who assist the store manager, and department managers, who are each

responsible for a department within the store.[6]  Most stores also have a bookkeeper who oversees

cashiers. McCormick Tr. 84:13-85:17.  Gristede's considers the store manager, assistant

manager, and department manager positions – but not the bookkeeper – to be managerial posts.

*Id.* at 85:8-20.  Throughout Gristede's grocery stores men hold predominate in management:  in

2006, of 183 management-level employees, only 10 were women. Crawford Table 4.

Entry level positions at Gristede's include clerks and cashiers, who form the largest

percentage of Gristede's employees. Criscuolo Tr. 26:15-27:6.  Cashiers are responsible for

operating the registers, straightening the front-end of the store, maintaining the health and beauty

department, and processing price changes. *Id.* at 28:24-29:14. Cashiers report to the bookkeeper

or front-end department manager. *Id.* at 32:19-33:3.  Clerks perform a variety of tasks, such as

unloading trucks, taking deliveries, unpacking and stocking products, performing price changes,

and sweeping and cleaning the floors.  Clerks report to the manager of the department to which

they are assigned or to the store manager or assistant manager. *Id.* at 27:7-28:17, 30:4-32:2.

Gristede's segregates its entry-level positions by gender: in 2006 over 95% of cashiers were

female, while over 76% of clerks were male. Crawford Table 4.  Clerks (i.e., primarily men) are

more likely to be promoted than cashiers (i.e., primarily women). *Id.* at ¶ 19.

## II.  Gristede's Has Uniform Personnel and Promotion Policies Across Stores.

Gristede's hiring and promotion practices do not vary by store or district.  The human

resources department, which processes new hires and promotions for all stores, is centrally

---

[4] Ferdinand Tr. 16:12-17:16; Ma Tr. 27:10-20; Mendoza 16:8-20, 17:11-18:2; Moore 14:18-21, 20:24-21:8.
[5] Gristede's sometimes also referred to its assistant managers as co-managers. Lang Tr. 83:4-14.
[6] Criscuolo Tr. 33:9-10; McCormick Tr. 71:6-72:6; 63:9-64:11.

located and is headed by Deborah Clusan.  Clusan Tr. 62:24-63:16; McCormick Tr. 25:19-26:6.

Michael McCormick, who reports to Clusan, oversees hiring for the entire company, and until

September 2007, personally hired every new entry-level employee.  McCormick still oversees

hiring, but now involves four store-level managers in the initial screening process.[7]

### A.  Gristede's Has Common Practices and Policies for Hiring New Employees.

Gristede's hires all its new employees through the Main Office.[8]  It does not regularly post or

otherwise formally inform employees of open positions.[9]  Instead, store-level managers

communicate their personnel needs to McCormick, who chooses people to fill the openings.

McCormick Tr. 26:13-27:2.  Until September 2007, people interested in working at Gristede's

went to the Main Office where McCormick interviewed them, decided who to hire, and

determined which position to assign new hires to.  *Id.* at 29:8-30, 30:9-31:20, 99:19-100:6. As of

September 2007, Gristede's authorized four store managers ("Hiring Managers"), all male, to

interview applicants at their stores, but McCormick still must approve their recommendations.[10]

### B.  Gristede's Gives Hiring Personnel Broad Discretion But No Guidance on How to Exercise It.

Gristede's has no formal or written hiring criteria, and no manual outlining any type of hiring

or job placement process.  McCormick Tr. 35:19-37:3.[11]  Aside from requiring applicants to

verify their identity, Gristede's did not tell decisionmakers what selection criteria to use in

screening clerk and cashier applicants.  *Id.* at 55:16-57:3, 57:25-59:15.  Therefore, instead of

using clearly delineated job qualifications, Gristede's relies on crude subjective measurements to

---

[7] McCormick Tr. 29:8-30:7, 31:3-6; Criscuolo Tr. 54:2-4; Moore Tr. 24:15-25:8, 28:6-29:8, 31:9-17, 58:14-59:6.
[8] Criscuolo Tr. 54:2-7, 62:6-19; McCormick Tr. 30:24-31:2; Moore Tr. 27:13-28:5.
[9] Criscuolo 86:25-87:5; McCormick Tr. 31:7-33:9, 97:22-24, 135:24-136:5; Lang Tr. 55:11-13.
[10] Moore Tr. 24:15-25:8, 28:6-29:4, 29:5-8, 31:19-32:3, 58:14-59:6.
[11] Also, while Plaintiffs requested documents about Defendants' "policies, practices, procedures, or criteria for evaluating and selecting job applicants," Defendants did not produce any materials setting forth promotion or hiring criteria. Hoffman Exh. 31 ("Def. First Disc. Resps.") at 8-9.

select employees. For instance, McCormick bases his decision to hire an individual on whether

he thinks the applicant is "honest" and "friendly." *Id.* at 36:19-37:17.

McCormick had no human resources experience before joining Gristede's and Gristede's

never trained him to screen applicants. Criscuolo Tr. 57:6-22. His only training was a "short"

orientation and a sexual harassment training. McCormick Tr. 14:25-15:15, 37:21-39:22.

Similarly, Gristede's has not trained the Hiring Managers about their hiring duties.[12] No one at

Gristede's reviews the ad hoc hiring "process" McCormick implemented or the hiring decisions

he makes.[13] As a result, hiring decisions at Gristede's are entirely unguided and unsupervised,

left up to the unreviewed discretion of the five men who interview job applicants.

### C. Gristede's Relies on Managers' Subjective and Discretionary Promotion Recommendations, but Provides No Guidance on How to Make Recommendations.

Gristede's tends to promote employees from within.[14] In theory, an employee in any position

may be considered for a promotion.[15] A part-time employee may be promoted to full-time

status.[16] Clerks and cashiers may be promoted to department manager, or even assistant manager

or store manager, depending on the specific circumstances of the employee in question.[17]

Gristede's does not have any formal application or interview process for making

promotions.[18] Instead, Gristede's selects candidates for promotion through recommendations

from store-level managers or District Managers, or when candidates personally express an

interest in a promotion and then receive recommendations from their superiors.[19] Store

managers convey recommendations for employees in their stores to the District Managers, who

---

[12] Clusan Tr. 70:10-12; Moore Tr. 52:21-53:18, 55:12-15, 57:4-24, 58:21-59:15.

[13] Clusan Tr. 67:9-14; Criscuolo Tr. 57:23-25; McCormick Tr. 118:4-9; Lang 55:14-23.

[14] Criscuolo Tr. 43:2-6; McCormick Tr. 33:10-13; Lang Tr. 40:12-16.

[15] Criscuolo Tr. 101:9-102:20; McCormick Tr. 55:17-56:8, 78:11-79:14; Lang Tr. 90:25-91:14.

[16] Monos Tr. 86:3-10; Lang Tr. 78:14-24.

[17] Lang Tr. 68:12-69:13, 76:3-24, 91:5-14; Criscuolo Tr. 84:24-86:13, 99:15-22, 100:15-22.

[18] McCormick Tr. 126:11-14; Lang Tr. 57:14-17; Criscuolo Tr. 104:16-20.

[19] McCormick Tr. 142:3-15; Monos Tr. 48:21-49:19; Ferdinand Tr. 70:19-24.

forward the recommendations to McCormick. McCormick Tr. 126:17-127:18; Lang 40:17-25. McCormick then completes paperwork to formalize the promotion and sends it to Criscuolo, who must sign off on all promotions. McCormick Tr. 126:7-127:18, 142:3-15.[20]

While Gristede's relies on manager recommendations and self-identification for promotions, it does not give managers any guidance on what to look for in nominating employees. As with hiring, Gristede's has no written guidelines and provides no training about how to make promotions or what factors to consider.[21] Gristede's also does not inform employees that, to be considered for a promotion, they must tell someone that they are interested in a more senior position. Monos Tr. 49:20-23; Lang 91:18-92:17; Ferdinand Tr. 73:18-21; Mendoza Tr. 68:13-20. Because Gristede's does not usually post promotional opportunities, employees typically hear about such vacancies only via word of mouth, if they hear about them at all.[22]

With no clearly defined promotion criteria or procedures, Gristede's uses an ad hoc "tap on the shoulder" system and purely subjective considerations to make promotions.[23] Managers target individuals they know for management positions.[24] One store manager makes promotion recommendations based on an employee's character, demonstration of ambition (Mendoza Tr.

---

[20] *See also* Criscuolo Tr. 79:16-80:23, 84:24-86:8, 93:15-102:20, 116:21-117:22; Lang Tr. 99:25-100:24; Monos Tr. 44:13-46:4, 68:2-69:2.

[21] Lang Tr. 42:8-13; Criscuolo Tr. 78:17-20, 106:25-107:4. Store managers Moore, Ferdinand, and Mendoza, and District Managers Lang and Monos all testified that they were unaware of any documents identifying promotion criteria. Lang Tr. 91:15-17; Monos Tr. 112:13-18; Moore Tr. 84:6-9; Ferdinand Tr. 70:25-71:4; Mendoza Tr. 61:17-19. The store managers testified that Gristede's never trained them to make promotion assessments. Moore Tr. 78:25-80:3; Ferdinand Tr. 71:13-16; Mendoza Tr. 61:13-16. Gristede's did not produce discovery "documents [or] electronic information that refer or relate to Defendants' policies, practices, procedures, or criteria for promotions." Def. First Disc. Resps. at 7-8.

[22] McCormick Tr. 133:14-19; Lang 55:2-13; Moore Tr. 72:21-24, 80:4-81:10, 84:15-22; Ferdinand Tr. 69:24-70:3.

[23] Duling Dec. ¶ 9; Bueford Dec. ¶ 10; Davila Dec. ¶ 8; Echevarria Dec. ¶ 12; Chewning Dec. ¶ 10; Ramos Dec. ¶ 8; Lang Tr. 70:19-75:6; Sewer Dec. ¶ 12.

[24] Lang Tr. 20:7-16, 87:4-15; Monos Tr. 44:19-45:9, 46:5-18, 99:2-9, 112:22-113:2; Chewning Dec. ¶ 5 (manager approached him to ask if he was interested in co-manager position).

23:23-24:6, 60:11-61:12), and on his own "gut feeling" whether the employee "can do a different type of job" (*Id.* at 61:20-62:7). Similarly, with respect to department managerial candidates, District Manager Lang looks for someone who is "willing to be taught and trained and developed" and for "just the right, you know, mentality whether they want to do it." Lang Tr. 55:24-57:13. Though Lang said that past job performance is considered in determining whether someone should be promoted, *id.* at 27:25-28:8, Gristede's does not conduct performance evaluations or review personnel files as part of promotion decisions, *id.* at 58:17-25.[25]

The career path of Gristede's store manager Sandi Molina (a male) exemplifies Gristede's tap-on-the-shoulder promotion system. Gristede's hired Molina as a part-time clerk in 1989 and promoted him to co-manager in 1995. Gristede's did not post the co-manager position, Molina did not apply for it, and Gristede's did not interview Molina. Instead, Molina's supervisor approached Molina directly and asked if he wanted to be co-manager. In 1996, Gristede's promoted Molina to store manager. Again, he did not apply or interview for the position, but rather, his supervisor approached him directly and offered him the position. Molina Tr. 101-08.

### III. Gristede's Does Not Monitor Its Hiring and Promotion Policies and Practices to Ensure that They Are Non-Discriminatory.

Gristede's has done nothing to ensure that its hiring and promotions are not discriminatory. Gristede's does not have even a basic equal employment opportunity policy and does not train its managers or human resources employees about any anti-discrimination laws.[26]   Gristede's does not have an affirmative action plan or policy with respect to hiring or promoting women.[27]

---

[25] *See also* Monos Tr. 37:14-21; Ferdinand Tr. 66:20-25; Mendoza Tr. 28:25-29:3, 65:24-67:3, 69:11-23; Moore Tr. 41:23-42:2, 81:11-15.

[26] McCormick Tr. 35:3-18; Ferdinand Tr. 80:25, 81:8; Mendoza Tr. 76:5-8; Moore Tr. 87:16-24; Clusan Tr. 69:7-70:18; Monos Tr. 41: 5-10..

[27] Lang Tr. 42:8-23; Clusan Tr. 71:10-72:9; Ferdinand Tr. 80:19-24; McCormick Tr. 41:25-42:20; Monos Tr. 41:13-42:22.

Gristede's does not maintain records of its hiring and promotion process. It does not track when positions are advertised, what criteria are used in making decisions, who applied or what candidates were considered for a particular position, or why one individual was selected over another. Clusan Tr. 26:9-15; Lang 92:18-93:13; McCormick Tr. 120:18-20. Gristede's does not have written job descriptions or list vacant positions or promotional opportunities.[28] Further, Gristede's Human Resources department fails to exercise any oversight over the promotion process. Clusan Tr. 67:4-5; Criscuolo Tr. 57:23-25.

## IV. Statistical Analysis Shows Gender Discrimination at Gristede's.

As a result of Gristede's managers' subjective and unguided decisions, female employees are clustered in lower-level, lower-paying positions and have fewer promotional opportunities than men. Dr. David L. Crawford, an economist who reviewed demographic data about Gristede's workforce,[29] found that female employees in Gristede's stores are overrepresented in lower-level, non-supervisory positions; promoted at a slower rate than male employees; and underrepresented in managerial positions. The probability that these distributions were the result of gender-neutral causes was very low and, in some instances, virtually nil.

First, the statistical evidence shows gender segregation at Gristede's stores. Gristede's chooses men for management positions and confines women to its lowest ranks. About 95% of Gristede's managers are men, while over 90% of its cashiers are women. Crawford Table 4. In addition, gender segregation occurs within job categories: among managers, almost all dairy, meat, produce, and deli managers are men, while café and front-end managers tend to be women.

---

[28] Lang Tr. 55:2-13, 58:10-16; McCormick Tr. 52:23-25, 68:9-11, 71:13-23; Ferdinand Tr. 23:12-17; Mendoza Tr. 67:12-68:16; Moore Tr. 80:4-22; Davila Dec. ¶ 8; Duling Dec. ¶ 9; Echevarria Dec. ¶ 12; Gonzalez Dec. ¶ 8; Johns Dec. ¶ 10; Chewning Dec. ¶ 10; McDonald Dec. ¶ 9; Ortiz Dec. ¶ 10; Ramos Dec. ¶ 8; Yas. Santiago Dec. ¶ 8; Gonzalez Dec. ¶ 9; Singleton Dec. ¶ 9.
[29] For a complete summary of Dr. Crawford's credentials and the materials he reviewed to form his expert opinion, *see* Crawford ¶¶ 2-4 & Exh. 1 and ¶¶ 9, 11 & Exh. 2.

Bielby ¶ 19 & Exh C. At the entry-level, women hold over 90% of cashier positions, while men occupy more than 69% of clerk jobs – and Gristede's is more likely to promote clerks than cashiers into higher paying manager positions. Crawford Tables 3, 4.[30]

Second, the statistical evidence shows gender discrimination in promotions at Gristedes. If Gristede's made promotions on a gender-neutral basis, of the 94 first-time promotions to manager positions for all employees up to the store manager level between 1999 and 2007, 38 would have gone to women. *Id.* at ¶¶ 11-12. But Gristede's gave only ten of these promotions to management to women. *Id.* at ¶ 12. The odds that Gristede's happened just by chance to promote only ten women into management is 1 in 6,130,000,000. *Id.* at ¶ 16. This reflects 6.3 standard deviations in a two-tailed test, far greater than the two or three standard deviations that courts accept as probative evidence of discrimination.[31] In other words, it is exceedingly unlikely that Gristede's does not discriminate against women in promotions.

Third, the statistical evidence shows gender discrimination in initial job assignments at Gristede's. Crawford conducted a statistical analysis to determine whether factors other than gender could explain the shortfall in Gristede's promotion of women to management positions. As for the impact of an employee's position on their chances of promotion, Crawford found that 73.4% of managers were promoted from the ranks of clerks while only 5.3% were promoted

---

[30] Even among clerks, Gristede's workforce displays significant gender segregation by department. Bielby ¶ 17 & Exh C.

[31] Crawford ¶¶ 14, 16; *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (noting that courts generally consider disparities of two standard deviations or more "sufficient to warrant an inference of discrimination" (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 365-66 (2d Cir. 1999)); *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991)("finding of two or three standard deviations … is generally highly probative of discriminatory treatment"); *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 373 (2d Cir. 1989) ("finding of two to three standard deviations can be highly probative of discriminatory treatment"); *cf. Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977) (in reviewing statistical evidence offered in support of jury discrimination claim, noting that "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist").

from among cashiers. *Id.* at ¶ 20.  Significantly, Gristede's is far more likely to give clerk positions to men, and cashier positions to women. *Id.* at Table 4.

Gristede's method of assigning new hires to either a clerk or cashier position is extremely unlikely to be gender-neutral.  Crawford found that if these initial job assignments were gender-neutral, then between 1999 and 2007 Gristede's would have hired roughly 1038 women as clerks – but it hired only 319.  Crawford ¶ 22.  The probability that this substantial shortfall occurred by chance is so miniscule that the computer "cannot compute it and reports a zero." *Id.* at ¶ 23.  The disparity between expected and actual assignments of new female hires to the clerk pool amounts to 6 standard deviations, much greater than the two to three standard deviations that courts have accepted as evidence of discrimination.[32]  In other words, there is next to no chance that Gristede's segregation of women in cashier positions and exclusion of women from clerk positions was not gender-related.

Finally, the statistical evidence shows gender discrimination in wage rates at Gristede's.  Crawford reviewed the hourly wage rates of all Gristede's employees.  Between 2000 and 2007, women earned anywhere from 11.7% to 24.5% less than men over the same year, figures that correspond to standard deviations of 7 or more.[33]  Crawford Table 8.  These disparities "reflect the combined effects of any gender patterns in initial job assignments, subsequent assignments and promotions, and discretionary changes in wages." *Id.* at ¶ 28; *see also id.* at ¶ 30.

## V.  Gristede's Personnel Practices and Policies Lack Mechanisms Known to Minimize Workplace Bias.

---

[32] *See cases cited footnote 31 supra.*

[33] Although the standard deviations fall to less than two when the impact of job title on wages is considered, as explained above, Gristede's job assignments are not gender-neutral and thus job titles are not gender-neutral criteria. *Id.* at ¶ 29.

Dr. William Bielby, a sociologist,[34] evaluated Dr. Crawford's report and Gristede's personnel policies and practices in light of "social science research that explains what kinds of policies and practices create and sustain barriers to equal employment opportunity and what kinds minimize those barriers." Bielby ¶ 9. Bielby found that Gristede's lacked those policies and practices that research has identified as minimizing workplace discrimination while following those that allow workplace bias to flourish unchecked. Among other things, Dr. Bielby concluded that:

- the "absence of monitoring and oversight, inadequate equal employment opportunity policies and practices, and vague and highly discretionary criteria and processes for making decisions about hiring, job assignment, and promotion creates and sustains a highly segregated workforce and gender disparities in promotion rates at Gristede's"; and
- "[s]egregation and barriers to advancement in turn explain the pay gap between men and women at the company."

*Id.* at ¶ 50. As for sex segregation in initial job assignments, Bielby notes that it is "extremely unlikely" that the reason Gristede's fills most clerk jobs with men is that men are more likely to have any skills or experiences needed for the job; the same is true for Gristede's steering women into cashier jobs. *Id.* at ¶ 21. It is "extremely unlikely" because these jobs "do not require highly specialized skills, education, training, or prior work experience," as attested by Gristede's own managers. *Id.* at ¶ 21. Rather, as social science scholarship has shown, in organizations with high levels of job segregation, "the strongest predictor of whether an open position is filled by a man or woman is the gender of the previous holder." *Id.* at ¶ 22. Jobs with distorted gender ratios, typically more than 85% of one gender, become "sex labeled" as "men's work" or "women's work" depending on which gender predominates. *Id.* at ¶ 23. "[G]ender becomes part of decision makers' schema (through the process of repeated observation)" so that "when

---

[34] For a complete summary of Dr. Bielby's credentials and the materials he reviewed to form his expert opinion, *see* Bielby ¶¶ 3-5, Exh. B, and ¶¶ 7-8.

decision makers use these gender-associated schemas in hiring and promotion decisions, the current gender composition of the job is recreated." *Id.* (quotations omitted).

Unmonitored, discretionary decision-making provides ample opportunity for the operation of both conscious bias and subconscious sex stereotyping. *Id.* at ¶ 25. As Bielby explains:

> sex segregation is often sustained by highly discretionary and subjective personnel practices, especially when there is little oversight and accountability regarding: (1) the process used to make decisions about hiring, job assignment, promotion, and other career outcomes; and (2) the impact of personnel policies and practices on equal employment opportunity.

*Id.* at ¶ 22. To combat employment discrimination, "clearly specified and relevant criteria, along with effective monitoring and accountability are necessary to minimize the impact of stereotypes and gender bias" -- not wholly unchecked personnel practices like Gristede's, *Id.* at ¶ 30.

Gristede's company-wide operations typify those personnel policies and practices that foment gender bias while including hardly any of those that minimize bias. *Id.* at ¶¶ 34-50. Gristede's fails to show any interest in or commitment to antidiscrimination principles or equal employment opportunity at even the most superficial and basic level. The company has no equal employment opportunity policy (aside from a written policy against sexual harassment) and has not trained its human resources or managerial personnel on equal employment opportunity issues. *Id.* at ¶¶ 46-48. Gristede's affords these untrained personnel broad discretion in making personnel decisions, but provides little, if any, direction about what criteria to consider and how to assess potential job applicants or candidates for promotion. *Id.* at ¶¶ 34, 38; Section II.A.-B. *supra.* Nor does Gristede's have written job descriptions of its positions or require evaluations of employee performance. *Id.* at ¶ 34; Section III *supra.* Left to their own devices, Gristede's managers rely on highly subjective criteria and informal assessment methods to make personnel decisions. *Id.* at ¶¶ 34-38; Section II.A.-B. *supra.* Gristede's fails to monitor and evaluate the managers' personnel decisions so it has no way of knowing by what methods job assignments or

promotion decisions are made, which candidates are selected and which are denied, and what factors underlie the personnel decisions that are made. *Id.* at ¶¶ 43-45; Section III *supra.*

## VI. Anecdotal Evidence from Plaintiffs and Other Employees Further Demonstrates Gender Discrimination at Gristede's.

Anecdotal evidence confirms the experts' evidence of gender discrimination. Employees have confirmed that Gristede's discriminates against women in hiring by routinely steering them into cashier positions.[35] For example, Plaintiff Anderson testified that when she applied to Gristede's she asked about a clerk position but was told that Gristede's needed "big guys" for that position. Anderson Charge at ¶ 6. She was told that the only position for which Gristede's would consider her was cashier. *Id.* at ¶ 7. Plaintiff Duling testified that when she applied for a position with Gristede's, the person who took her application said that "the only work was cashier work" and that "there wasn't anything else open."[36] Other female applicants were likewise told that the only jobs available to them were cashier positions.[37]

Female employees also have attested to Gristede's failure to provide them the same promotional opportunities it gives men: while Gristede's steered them into cashier positions, it would not consider cashiers for promotion to managerial positions.[38] Plaintiff Duling found that despite her experience and qualifications, including a college degree, Gristede's never promoted her from cashier or even informed her of promotion opportunities. Duling Dec. ¶¶ 9, 10. Other qualified women also were not made aware of or considered for promotion opportunities.[39]

---

[35] Chewning Dec. ¶ 7; Echevaria Dec. ¶¶ 5-8; Gonazales Dec. ¶¶ 3-4; Johns Dec. ¶¶ 5-6; McDonald Dec. ¶¶ 3-6; Ortiz Dec. ¶¶ 5-6; Yes. Santiago Dec. ¶¶ 6-9.

[36] Duling Tr. 52:24-53:19, 55:6-11.

[37] Johns Dec. ¶¶ 5-6; Echevaria Dec. ¶¶ 5-8; Gonazales Dec. ¶¶ 3-4; McDonald Dec. ¶¶ 3-6; Ortiz Dec. ¶¶ 5-6.

[38] Bueford Dec. ¶ 9; Davila Dec. ¶ 7; Johns Dec. ¶ 9; Ramos Dec. ¶ 7; Yes. Santiago Dec. ¶¶ 11-12.

[39] Echevarria Dec. ¶¶ 12-14; Gonzalez Dec. ¶ 5; McDonald Dec. ¶ 10; Ortiz Dec. ¶ 7; Ramos Dec. ¶ 5; Yas. Santiago Dec. ¶ 6.

**ARGUMENT**

This case is a simple challenge to Gristede's discriminatory job assignment, pay and promotion practices, which are uniform company-wide. Plaintiffs' class claims present common questions of liability and relief and are well-suited for class treatment under Rule 23.

## I.   Federal Courts Routinely Certify Gender Discrimination Claims that Challenge Subjective Decision-Making Practices and Procedures.

The origins of Rule 23, which governs the certification of class actions in federal court, are steeped in a civil rights and anti-discrimination tradition.[40] Because Title VII lawsuits are "by their very nature class suits, involving classwide wrongs," *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 421 U.S. 395, 405 (1977), civil rights cases alleging class-based discrimination are "prime examples" of classes that deserve certification – especially civil rights claims that challenge a systemic practice of subjective decision-making, *Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 615 (D. Minn. 2000). In *General Telephone & Telegraph Southwest v. Falcon*, the Supreme Court held that "an entirely subjective [employment] decisionmaking process" is a sound target for a class action. 457 U.S. 147, 159 & n.15 (1982). The Supreme Court later reiterated that subjective decision-making constitutes an identifiable and measurable employment practice that a plaintiff may challenge under a Title VII disparate impact theory. *Watson v. Fort Worth Bank of Trust Co.*, 487 U.S. 977, 990-91 (1988).

Courts in the Second Circuit have consistently certified Title VII class actions alleging systematic discrimination against female or minority employees through excessively subjective hiring, disciplinary, or promotion policies, especially where the plaintiffs offer statistical and

---

[40] FED. R. CIV. P. 23(b)(2), 1966 Amends. advisory comm. note (primary cases falling under this Rule are "various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration").

anecdotal proof that this unfettered discretion results in biased employment decisions.[41] These cases demonstrate Second Circuit courts' recognition of the importance of civil rights class actions and the reality that subjective decision-making can result in actionable discrimination.[42]

## II. Evidence Supports Certification of Plaintiffs' Claims under the Second Circuit's *IPO* Framework.

The Second Circuit clarified the Rule 23 threshold in *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) (*"IPO"*), holding that before certifying a class, a court must determine whether each of the Rule 23 requirements have been met. *Id.* at 41. In doing so, the court should not assess "any aspect of the merits unrelated to a Rule 23 requirement" or allow the class certification motion to "become a pretext for a partial trial of the merits." *Id.* *IPO* also held that in reviewing a certification motion, a court is to consider all relevant evidence, *id.* at 42, and determine whether the plaintiff has met the requirements of Rule 23 by a preponderance of the evidence, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 06-3794-cv, 2008 U.S. App. LEXIS 21498, at *15-16 (2d Cir. Oct. 14, 2008).

---

[41] *E.g., Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) (certifying claims challenging policy of delegating discretionary authority to supervisors to make personnel decisions); *Caridad v. Metro-N. Commuter R.R. Co.*, 191 F.3d 283 (2d Cir. 1999) *overruled on other grounds by In re Initial Pub. Offering Secs. Litig.*, 471 F.3d 24 (2d Cir. 2006) (reversing denial of class certification of claims of differential disciplinary treatment); *Velez v. Novartis Corp.*, 244 F.R.D. 243, 258-60 (S.D.N.Y. 2007) (granting certification; subjectivity of defendant's personnel system may present properly certifiable issue); *Hnot v. Willis Group Holdings*, 228 F.R.D. 476 (S.D.N.Y. 2005) (*"Hnot I"*) (certifying class of female employees; managers' unbridled discretion supported certification); *Warren v. Xerox Corp.*, 01-CV-2909, 2004 U.S. Dist. LEXIS 5115, at *37-38 (E.D.N.Y. Jan. 26, 2004) (certifying class; "subjective nature of the decentralized decisionmaking process does not prevent certification of plaintiffs' disparate impact and treatment claims"); *Latino Officers' Ass'n of N.Y. v. City of New York*, 209 F.R.D. 79 (S.D.N.Y. 2002) (certifying class alleging a subjective disciplinary process).
[42] *Accord Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168 (9th Cir. 2007); *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627 (N.D. Cal. 2007); *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006); *McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428 (D.D.C. 2002); *Butler v. Home Depot*, No. C-94-4335 SI, C-95-2182 SI, 1997 U.S. Dist. LEXIS 16296 (N.D. Cal. Aug. 28, 1997); *Shores v. Publix Super Mkts.*, 95-1162-CIV-T-25(E), 1996 U.S. Dist. LEXIS 3381 (M.D. Fla. Mar. 12, 1996); *Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 335 (N.D. Cal. 1992).

Significantly, nothing in *IPO* undercuts the long line of cases acknowledging that "statistical evidence can demonstrate commonality in a challenge to subjective employment practices." *Hnot v. Willis Group Holdings*, 241 F.R.D. 204, 210 (S.D.N.Y. 2007) ("*Hnot II*"). Moreover, many of these decisions remain instructive even after *IPO* because they were based on thorough analyses of all relevant evidence – i.e., analyses that foreshadowed the clarification made in *IPO*. For example, in *Hnot v. Willis Group Holdings*, which pre-dates *IPO*, the court certified a class of female employees alleging gender discrimination in pay and promotion. 228 F.R.D. 476 (S.D.N.Y. 2005) ("*Hnot I*"). The court denied defendant's motion for reconsideration after *IPO*, noting that in its original certification analysis it had "considered both plaintiffs' and defendants' evidence," *Hnot II*, 241 F.R.D. at 206, and had "avoided the 'some showing' standard that was specifically disavowed by *In re IPO*," *id.* at 208.[43]

### III. The Evidence Supports Class Certification.

To obtain class certification, plaintiffs must establish that they have met all four requirements of Rule 23(a) and fall into one of the categories of Rule 23(b). Fed. R. Civ. P. 23(a) & (b). Rule 23's requirements are construed liberally in the plaintiffs' favor. *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202 (S.D.N.Y. 2006). Rule 23(a) provides that class certification is proper where:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Here, Plaintiffs meet all these prerequisites and satisfy Rule 23(b)(2) because Gristede's "acted

---

[43] *See also, e.g, DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 474 (S.D.N.Y. 2005) (noting standard at certification stage is higher than on motion to dismiss and reviewing both sides' evidence in ruling on motion); *McBean v. City of New York*, 228 F.R.D. 487 (S.D.N.Y. 2005) (noting that "rigorous analysis" of certification motion may require "prob[ing] behind the pleadings.")

… on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

## A. Plaintiffs Meet the Requirements of Federal Rule of Civil Procedure 23(a).

### 1. The Proposed Class is Sufficiently Numerous and Joinder of All Members is Impracticable.

Rule 23(a)(1) requires that the proposed class be so numerous that "joinder of all members is impracticable." Courts do not require evidence of the exact size of the class nor the identity of class members to satisfy the numerosity requirement. *E.g., Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993); *In re Parmalat Secs. Litig.*, 04 Civ. 0030, 2008 U.S. Dist. LEXIS 64296, at *14-15 (S.D.N.Y. Aug. 20, 2008) ("*Parmalat*"). Nor do courts require any minimum number of class members to sustain a class action. *Latino Officers Ass'n of N.Y. v. City of New York*, 209 F.R.D. 79, 88 (S.D.N.Y. 2002). While "numerosity is presumed where the class consists of at least 40 members," *Parmalat* at *15, "classes as small as 35 have met this requirement," *Latino Officers* at 88 n.68. Ultimately, courts "draw reasonable inferences from the available evidence" in evaluating whether a proposed class is sufficiently numerous. *Parmalat* at *14-15. Gristede's has employed at least 668 women in cashier positions since 2004, all of whom fall within the proposed class definition, which plainly satisfies the numerosity requirement. Crawford Table 4.

In addition to considering the size of the putative class when evaluating numerosity, courts are to look at "all the circumstances surrounding a case," including "financial resources of class members [and] the ability of claimants to institute individual suits." *Robidoux*, 987 F.2d at 936. Putative class members in this case, low-paid hourly workers at a grocery chain, are unlikely to have the resources to sue individually, so certification, would permit them to pool their resources

to enforce their rights.[44]

### 2. The Class Claims Present Many Common Issues of Law and Fact.

Rule 23(a)(2) requires "questions of law *or* fact common to the class." (Emphasis added.) "The threshold of commonality is not high" and is aimed at "determining whether there is a need for combined treatment and a benefit to be derived therefrom." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986); *see also Cortigiano v. Oceanview Manor Home*, 227 F.R.D. 194, 205 (E.D.N.Y. 2005) (establishing commonality is a "minimal burden"). The Rule does not require that all questions of law or fact be common to every single member of the class, just that at least one issue is common to all class members.[45] Differences in the ways a defendant's discriminatory practices affect individual members of the class do not undermine commonality.[46]

Rather, the fact that members of the class may have experienced discrimination in different ways (*e.g.*, one was denied a promotion while another was steered into a dead-end position) is irrelevant where, as here, "[t]he legal theories under which the class representatives seek recovery are common throughout the class." *Latino Officers*, 209 F.R.D. at 88. Indeed, "[t]he delegation of discretionary authority to supervisors... constitutes a policy or practice sufficient to

---

[44] *E.g., Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.") (cited with approval in *Vengurlekar v. HSBC Bank USA*, No. 03 Civ. 243, 2008 U.S. Dist. LEXIS 11365, at *17 (S.D.N.Y. May 22, 2007)).

[45] *See Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992); *see also, e.g., Marisol A.*, 126 F.3d at 376 ("The commonality requirement is met if Plaintiffs' grievances share a common question of law or of fact."); *Brown v. Kelly*, 244 F.R.D. 222, 231 (S.D.N.Y. 2007)

[46] *Caridad*, 191 F.3d at 292-93 (certification not defeated merely because some class members suffered discriminatory discipline while others suffered discrimination in promotion); *Cokely v. N.Y. Convention Ctr. Oper. Corp.*, 00 Civ. 4637 (CBM), 2004 U.S. Dist. LEXIS 9264, at *15 (S.D.N.Y. May 21, 2004) ("class members need not allege that they all suffered the same injury to show commonality; demonstrating that all class members are *subject* to the same harm will suffice") (citing *Robinson*, 267 F.3d at 155); *Latino Officers Ass'n*, 209 F.R.D. at 88 ("the fact that defendants' allegedly discriminatory practices manifest in myriad ways cannot save the defendants from answering to the class of persons injured by those practices").

satisfy the commonality requirement" if that practice "is causally related to a pattern of disparate treatment or has a disparate impact." *Id.*; *see also Falcon*, 457 U.S. at 159 n.15 (granting certification where challenged policies manifested "in hiring and promotion practices in the same general fashion, such as through entirely subjective decision-making processes"). When there are only a few decisionmakers, as at Gristede's, commonality is more likely to be found.[47]

Here, both anecdotal and statistical evidence show that the class raises common issues of fact. All class members were subjected to the same company-wide hiring and promotion practices, which were set by senior management. The hiring policies and practices are uniform – a single decisionmaker, McCormick, either did or oversaw all entry-level hiring. *See* Section II.A. *supra*. Gristede's promotion policies and practices are likewise uniform – an unwritten, subjective system of selecting employees for promotion without posting or application. *See* Section II.B. *supra*. Statistical evidence shows that during the class period, Gristede's disproportionately clustered women in lower-level and lower-paying positions and was less likely to promoted them than their male counterparts. Common evidence, raising common issues of fact, includes evidence of senior management's failure to institute any equal employment opportunity policies, delegation of purely subjective hiring authority without any relevant training, failure to implement any standardized hiring or promotion criteria, failure to post job openings or promotional opportunities, plaintiffs' and class members' testimony about barriers to promotion, and statistical and social science expert analyses.

A common issue of law also binds this class – namely, that subjective decision-making can be a discriminatory hiring and promotion practice segregating women and barring them from

---

[47] *E.g., Hnot I,* 228 F.R.D. at 482-83 (commonality more apparent where alleged discrimination occurred "at the hands of the same regional officers"); *cf. Warren v. Xerox Corp.*, 01-CV-2909, 2004 U.S. Dist. LEXIS 5115 (E.D.N.Y. Jan. 26, 2004) (certifying class; "subjective nature of the decentralized decisionmaking process does not prevent certification of plaintiffs' disparate impact and treatment claims").

management.[48]  As seen in numerous cases, subjective decision-making alone is sufficient to

establish that a class shares common factual and legal issues for purposes of Rule 23. *E.g.,*

*Caridad*, 191 F.3d at 286; *Dukes v. Wal-Mart Stores*, 222 F.R.D. 137, 150 (N.D. Cal. 2004);

*Butler v. Home Depot, Inc.*, No. C-94-4335 SI, 1996 U.S. Dist. LEXIS 3370 (N.D. Cal. Jan. 24,

1996); *Stender v. Lucky Stores, Inc.*, No. C 88-1467, 1990 U.S. Dist. LEXIS 19985 (N.D. Cal.

June 8, 1990).  Because common factual questions are probative and material to each class

member's claim and because a single, well-recognized legal theory binds the claims, the

proposed class satisfies Rule 23(a)(2)'s commonality requirement.

### 3. The Proposed Plaintiffs' Claims are Typical of Those of the Class.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of

the claims or defenses of the class."  This "typicality" requirement is similar to Rule 23(a)(2)'s

"commonality," and the two tend to merge.  *Falcon*, 457 U.S. at 157 n.13; *Vengurlekar*, 2007

U.S. Dist. LEXIS 37521, at *17-18 (S.D.N.Y. May 22, 2007) (both are "guideposts for

determining whether . . . the named plaintiff's claim and the class claims are so inter-related that

the interests of the class members will be fairly and adequately protected in their absence"

(quotations and citation omitted)).

Typicality is satisfied where "each class member's claim arises from the same course of

events and each class member makes similar legal arguments to prove the defendant's liability."

*Id.*, at *18 (quotations omitted).  Further, as with commonality, typicality "does not require that

the factual background of each named plaintiff's claim be identical to that of all class members."

---

[48] While Plaintiffs and Defendants may dispute their respective experts' findings and
observations, or whether the subjective decision-making structure actually caused discrimination,
"this disagreement is relevant only to the merits of plaintiffs' claim -- whether plaintiffs actually
suffered disparate treatment -- and not to whether plaintiffs have asserted common *questions* of
law or fact."  *Hnot II*, 241 F.R.D. at 210; *see also Velez*, 244 F.R.D. at 257-58.

*Id.* (quotations omitted). If plaintiffs allege that they and the proposed class were subjected to the same unlawful conduct, "the typicality requirement is usually met irrespective of minor variations in fact patterns underlying individual claims." *Barone v. Safeway Steel Prods., Inc.,* 03 Civ. 4258, 2005 U.S. Dist. LEXIS 17645, at *12 (E.D.N.Y. Aug. 23, 2005) (quoting *Robidoux,* 987 F.2d at 936-37).[49]

Here, Gristede's steered Plaintiff Anderson into a cashier positions regardless of the job assignment she requested, and failed to promote Plaintiff Duling despite her qualifications and interest. *See* Section II *supra.* Gristede's subjected both (a) to the subjective promotion practice of tapping men on the shoulder for positions that it did not make available to women, and (b) to its hiring system that steered women into lower paying, dead-end jobs. Class members' claims – whether based on placement in lower-paying jobs or refusal to initially assign to a promotable position, or on denial of a promotion, because of their gender – flow from the same factual, legal, and remedial theories. Thus, the proposed class satisfies Rule 23(a)(3)'s typicality requirement.

### 4. The Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

Rule 23(a)(4) requires that representative parties "fairly and adequately protect the interests of the class." To meet this condition, Plaintiffs must show that their interests are not antagonistic to those of the class and that the proposed class counsel are qualified, experienced, and able to conduct the litigation. *See Baffa v. Donaldson,* 222 F.3d 52, 60 (2d Cir. 2000). With respect to the relative interests of the class representatives and class members, "[a] conflict or potential conflict alone will not…necessarily defeat class certification – the conflict must be

---

[49] *See also Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured" by same course of conduct).

fundamental." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (internal quotations omitted); *see also Ansoumana*, 201 F.R.D. at 87.

Here, nothing suggests that Plaintiffs' claims are in any way antithetical to those of the class. Plaintiffs challenge the same employment practices, and thereby raise the same questions of fact and law, as those impacting the class. Where the proposed class representatives' "claims are similar to those of the class, Plaintiffs' interests in recovering their claimed damages are not antagonistic to those of the other class members." *Vengurlekar*, 2007 U.S. Dist. LEXIS 37521, at *21. Additionally, the evidence shows that Plaintiffs have and will continue to fairly and adequately protect the interests of the class. More than three years after Plaintiffs filed their claims with the EEOC, they remain very involved in this case and committed to seeing it through. Both Plaintiffs reviewed the Amended Complaint before counsel filed it, worked with counsel to respond to Defendants' discovery demands, and have been deposed by Defendants.

**B.  Plaintiffs Meet the Standard for Class Action Certification under Rule 23(b)(2).**

Cases may be certified under Rule 23(b)(2) if the defendant "has acted or refused to act on grounds generally applicable to the class." Fed. R. Civ P. 23(b)(2) "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of such cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Cokely v. N.Y. Convention Ctr. Oper. Corp.*, No. 00 Civ. 4637, 2004 U.S. Dist. LEXIS 9264, at *28 (S.D.N.Y. May 20, 2004). To satisfy Rule 23(b)(2), plaintiffs must show that (1) they seek relief that is predominantly injunctive or declaratory, and (2) the defendant "acted or refused to act on grounds generally applicable to the class." Fed. R. Civ. P. 23(b)(2). Certification under 23(b)(2) is appropriate even if not every member of the class "felt the brunt of" the defendant's discrimination, so long as plaintiffs "would be entitled to the injunctive and declaratory relief that they seek with respect to the class as a whole." *Latino Officers*, 209 F.R.D. at 92.

The standard for granting class certification under Rule 23(b)(2) is not onerous. Indeed, some courts have held that so long as "Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." *Cokely,* 2004 U.S. Dist. LEXIS 9264, at *31 (quotations omitted).[50] District courts in and panels of the Second Circuit have frequently certified employment discrimination class actions under Rule 23(b)(2) where plaintiffs have requested both equitable and monetary relief.[51] *E.g., Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 19-20 (2d Cir. 2003) (certifying class where plaintiffs sought injunctive relief and monetary damages); *Robinson,* 267 F.3d at 164 (same); *Velez,* 244 F.R.D. at 271 (same); *Hnot I,* 228 F.R.D. at 486 (same). To determine Rule 23(b)(2) status, courts first examine the specific facts and circumstances of each case to see if the injunctive relief requested is a "predominant" component of the overall relief sought. *See, e.g., Parker,* 331 F.3d at 19-20 (for Rule 23(b)(2) purposes, court must assess relative importance of remedies sought, given all facts and circumstances); *Hnot I,* 228 F.R.D. at 486 (same).

The Second Circuit has rejected a "bright-line" test for certification under 23(b)(2). *Robinson,* 267 F.3d at 164 (rejecting rule that would require total absence of claims for compensatory and punitive damages). Accordingly, in cases such as this where the proposed class is seeking both injunctive and declaratory relief and monetary relief, a court may approve the class under Rule 23(b)(2) where "the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and . . . class treatment would be efficient and manageable, thereby

---

[50] *See also Hnot II,* 241 F.R.D. at 212 (Rule 23(b)(2) met if court "find[s] that, if plaintiffs succeed at trial, they will be entitled to the injunctive and declaratory relief that they seek." (quotations and citation omitted)).
[51] As the Second Circuit has noted, back pay may be sought in a Rule 23(b)(2) class action because it is "an equitable remedy similar to other forms of affirmative injunctive relief permitted in (b)(2) class actions [and] was an integral component of Title VII's 'make whole' remedial scheme." *Robinson,* 267 F.3d at 169 (internal citations omitted).

achieving an appreciable measure of judicial economy." *Id.* (internal quotation omitted).

Plaintiffs satisfy the first 23(b)(2) requirement because they seek relief predominantly injunctive and equitable in nature, including:

1)  a declaratory judgment that Gristede's employment policies, practices, and procedures violate federal, state, and city law and constitute discrimination on the basis of gender;

2)  a permanent injunction barring Gristede's from engaging in gender discrimination; and

3)  an order directing Gristede's to implement policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and to eradicate the effects of its prior unlawful employment practices.

Amended Complaint at ¶¶ 18-19. Injunctive and declaratory relief are both reasonably necessary and appropriate if Plaintiffs succeed on the merits.

Additionally, certification of a class under Rule 23(b)(2) is appropriate here because Plaintiffs have alleged that Gristede's acted on grounds generally applicable to the class. To satisfy Rule 23(b)(2)'s "generally applicable" provision, plaintiffs must show only that defendant's actions were based on factors that apply to all persons similarly situated. *Latino Officers*, 209 F.R.D. at 92 ("[a]ction or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class"). Rule 23(b)(2) does not require the movants to show that the defendant has acted directly against each member of the class.[52] Because Plaintiffs have alleged that Gristede's has acted (and has failed to act) on grounds generally applicable to the class, and have provided ample evidence that these general practices adversely affected them, Plaintiffs have met the requirements for Rule 23(b)(2).

Finally, there is no question that class treatment is manageable and would serve the interests of judicial economy. Certainly, it is more economical to adjudicate the merits in a class action

---

[52] Fed. R. Civ. P. 23(b)(2), 1966 Amends. advisory comm. Note.

than evaluate the merits of numerous individual claims against the same defendant based on the same questions of fact and law. Tellingly, courts in this circuit routinely grant Rule 23(b)(2) certification to Title VII discrimination claims. *See, e.g., Latino Officers, supra; Cokely, supra; Velez, supra; Hnot I, supra.* Accordingly, certification of this case as a class action pursuant to Rule 23(b)(2) is entirely appropriate. Plaintiffs ask that this Court direct that class members be provided court-approved notice of this action and an opportunity to opt out. The Court may do so pursuant to Rule 23(d), which permits it to issue such orders as are necessary.

## C. Outten & Golden LLP Should Be Appointed Class Counsel Pursuant to Rule 23(g).

This Court should appoint Outten & Golden LLP to represent the plaintiff class in this action. Rule 23(g) governs the standards and framework for the selection of class counsel for a certified class. Rule 23(g)(C) requires the Court to consider "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class." Here, Plaintiffs have hired experienced and well-qualified counsel to represent them and the proposed class. Plaintiffs' counsel have vigorously prosecuted this action and can more than adequately represent the interests of the class and the named Plaintiffs. Proposed class counsel are experienced and competent in class litigation and employment discrimination litigation. Hoffman Dec. ¶¶ 3-8; Klein Dec. *passim.*

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), name Susan Duling and Margaret Anderson as class representatives, appoint Outten & Golden LLP as class counsel, and approve the proposed notice about this lawsuit for dissemination to the class (Exhibit 32).

Dated:  November 17, 2008

New York, New York

Respectfully submitted,

/s/ Piper Hoffman
Piper Hoffman (PH 4990)

**OUTTEN & GOLDEN LLP**
Adam T. Klein (AK 3293)
Piper Hoffman (PH 4990)
Cara E. Greene (CG 0722)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  212-245-1000
Fax:  (212) 977-4005