UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SUSAN DULING, MARGARET ANDERSON,
and LAKEYA SEWER on behalf of themselves
and all others similarly situated,

        Plaintiffs,

    -v-                              No.  06 Civ. 10197 (LTS)(HBP)

GRISTEDE'S OPERATING CORP., et al.,

        Defendants.

-------------------------------------------------------x

## OPINION AND ORDER

APPEARANCES:

| | |
|---|---|
| OUTTEN & GOLDEN,LLP<br>By:   Adam T. Klein, Esq.<br>      Justin M. Swartz, Esq.<br>      Cara E. Greene, Esq.<br>3 Park Avenue, 29th Floor<br>New York, New York 10016 | MORGAN, LEWIS & BOCKIUS LLP<br>By:   Michael J. Puma, Esq.<br>      Amber L. Kagan, Esq.<br>101 Park Avenue<br>New York, New York 10178<br><br><br>FINKEL GOLDSTEIN ROSENBLOOM & NASH LLP<br>By:   Kevin J. Nash, Esq.<br>26 Broadway, Suite 711<br>New York, NY 10004 |
| *Attorneys for Plaintiffs* | *Attorneys for Defendants* |

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs Susan Duling, Margaret Anderson, and Lakeya Sewer (collectively "Plaintiffs") bring this action on behalf of themselves and all others similarly situated, asserting intentional discrimination and disparate impact claims for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. L. § 296 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"), by defendants Gristede's Operating Corp., Red Apple Group, Inc., d/b/a Gristede's, Gristede's Foods, Inc., Gristede's Delivery Service, Inc., Gristede's Foods NY, Inc., Gristede's NY, LLC, Namdor, Inc., and John Catsimatidis (collectively "Gristede's" or "Defendants").  Sewer also asserts individual claims for interference with her restoration rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"), and gender and pregnancy discrimination under § 8-107(1) of the NYCHRL.

The Court has federal question jurisdiction of Plaintiffs' Title VII and FMLA claims pursuant to 28 U.S.C. §§ 1331 and 1343.  The court has supplemental jurisdiction of the state statutory claims pursuant to 28 U.S.C. § 1367.

Plaintiffs now move for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure of their class claims asserted pursuant to Title VII and the state and local Human Rights laws.  Defendants oppose the motion, and move to strike two expert reports submitted by Plaintiffs in support of their motion.  For the reasons stated below, Defendants' motions to strike are denied and Plaintiffs' motion for class certification is granted in part.

BACKGROUND

Plaintiffs allege that Gristede's maintains a pattern and practice of intentional discrimination against women in terms of hiring and promotions, and that its hiring, promotion and compensation policies have an illegal disparate impact on women.  Women, according to Plaintiffs, are predominantly steered or placed initially into "cashier," as opposed to "clerk" positions, regardless of their qualifications or interests.  (Second Am. Compl. ¶¶ 3, 69-71).  Plaintiffs further allege that Gristede's selects managers, who are almost exclusively promoted from within the company, predominantly from among clerks.  (Id. ¶¶ 77-79.)  According to Plaintiffs, the combination of initially placing women in certain positions upon hiring and seldom promoting employees from those positions results in a dearth of women in management positions.  These hiring and promotion practices are not undertaken pursuant to a formal policy.  Rather, hiring and promotion from all entry-level positions is done pursuant to unwritten, subjective and discretionary processes.  (Id. ¶¶ 5, 78-79.)  Plaintiffs argue that the unconstrained discretion exercised by the individuals who make Gristede's hiring and promotion decisions causes those individuals' biases to manifest themselves in the company's practices.  (Id. ¶¶ 79-81.)

The Court has performed a rigorous review of the parties' extensive evidentiary submissions in connection with this motion practice.  The following factual summary presents the Court's findings as to undisputed facts, and findings as to disputed ones, that are relevant to Plaintiff's class certification motion.

Gristede's operates a chain of forty-two grocery stores in and near New York City. (Decl. of Cara E. Greene ("Greene Decl."), Ex. 5, Tr. of Dep. of Christopher Lang ("Lang Dep.") at 19:14-16; Greene Decl., Ex. 2, Tr. of Dep. of Charles Criscuolo ("Criscuolo Dep.") at 37:22-38:5.) The stores are divided into two districts, each of which is overseen by a "district manager."

(Criscuolo Dep. at 37:7-21.)  Each district manager, in turn, supervises the "store managers" who run the grocery stores within his district.  (Id. at 32:10-12, 37:3-6.)  Individual stores are separated into departments, each of which is staffed by clerks and may be run by a "department manager." (Id. 26:15-32:9.)  The majority of clerks and cashiers are part-time employees.  (Greene Decl., Ex. 11, Tr. of Dep. of James Monos ("Monos Dep.") at 87:14-18.)

Until September 2007, every decision regarding whether to hire an applicant for an entry-level position at Gristede's and the placement of successful applicants was made by Michael McCormick.  (Greene Decl., Ex. 7, Tr. of Dep. of Michael McCormick ("McCormick Dep.") at 118:4-13; Greene Decl., Ex. 1, Tr. of Dep. of Deborah Clusan ("Clusan Dep.") at 67:6-14; Criscuolo Dep. at 57:23-25; Lang Dep. at 55:14-23; Greene Decl., Ex. 10, Tr. of Dep. of Mitchell Moore ("Moore Dep.") at 24:20-25:8, 28:13-16, 29:23-30:5, 58:14-59:4.)  McCormick, who has been Gristede's Human Resources Specialist since approximately December 2003 (McCormick Dep. at 13:2-5), has a college degree in human resource management, but no other post-college work experience or other experience in human resources.  (McCormick Dep. at 14:25-15:15; Criscuolo Dep. at 57:9-22.)  McCormick received no training regarding employment and anti-discrimination laws, and essentially no training on how to determine whether an applicant is qualified for a particular entry level position.  (McCormick Dep. at 37:18-41:24.)  McCormick decides whether to hire an applicant on the basis of purely subjective criteria, namely his impression of "how [applicants] conducted themselves, [whether they] were . . . friendly, [and whether they] were . . . honest" during the interview.  (McCormick Dep. at 117:7-18:3; see also id. at 36:19-37:17.)  Charles Criscuolo, who is Gristede's senior executive vice president and who "run[s] the operations of the company" (Criscuolo Dep. at 24:3-23), "imagine[s]" that McCormick bases his hiring decisions "on the needs of the company" and is "sure [McCormick] has his

requirements on interviewing and talking to the people to see what it would be like for their

specific requirements" (Criscuolo Dep. at 55:20-56:17).

There are no written descriptions of Gristede's entry level positions.  (Decl. of

Michael J. Puma ("Puma Decl."), Ex. N., Tr. of Dep. of Angelo Mendoza ("Mendoza Dep. (Def.)")

at 81:3-5.)  While applicants for entry level positions are given the opportunity to state the position

for which they are applying (McCormick Dep. at 99:3-10), they are not told which positions are

available (McCormick Dep. at 97:22-24).  McCormick decides into which position to place a

successful applicant on the basis of the length of time each available position has been open and the

amount of pressure he receives from store managers to fill particular openings.  (McCormick Dep.

at 99:19-100:6.)  At his deposition, McCormick denied having suggested to any applicant that they

apply for a specific position.  (Puma Decl., Ex. K, Tr. of Dep. of Michael McCormick

("McCormick Dep. (Def.)") at 102:19-104:7, 106:24-108:6.)  He testified that, when an applicant

asks which positions exist, McCormick "run[s] through a list of what the positions are, off the top

of [his] head, real quick," but does not otherwise make suggestions to the applicant.  (McCormick

Dep. (Def.) at 103:2-11.)  Since September 2007, hiring and initial placement decisions have also

been made by four male store managers, who were given no direction as to how to make those

decisions other than to verify that applicants have valid identifying documents.  The managers'

decisions are reviewed by "headquarters."  (Moore Dep. at 24:20-32:17, 54:13-60:3.)

A number of present and former Gristede's employees, including the named

plaintiffs, proffer that they and other female applicants were "steered" into cashier positions;

several state that they were told on applying that only cashier positions were available.  (Greene

Decl., Ex. 3, Tr. of Dep. of Susan Duling ("Duling Dep.") at 53:6-19; Greene Decl., Ex. 15, Decl. of

Susan Duling ("Duling Decl.") ¶ 4; Greene Decl., Ex. 16, Decl. of Opalita Echevearria

("Echevearria Decl.") ¶¶ 6-7; Greene Decl., Ex. 17, Decl. of Cynthia Gonzales ("Gonzales Decl.")
¶ 3; Greene Decl., Ex. 20, Decl. of Racquel McDonald ("McDonald Decl.") ¶ 6; Greene Decl., Ex.
21, Decl. of France Ortiz ("Ortiz Decl.") ¶ 5; Greene Decl., Ex. 23, Decl. of Yashira Santiago
("Yashira Santiago Decl.") ¶ 4; Greene Decl., Ex. 24, Decl. of Yesenia Santiago ("Yesenia
Santiago Decl.") ¶ 6; Greene Decl., Ex. 26, Decl. of Ebony Singleton ("Singleton Decl.") ¶ 5).  One
declarant alleges that, when she and a man applied and both expressed interest in two open
positions – one for a cashier and one in "deli" – the man was given the deli position.  (Greene
Decl., Ex. 18, Decl. of Dailin Gonzalez ("Gonzalez Decl.") ¶ 5.)  Defendants proffer that most
cashier applicants are women and that the women express their preference for the cashier position.
(Defs.' Br. 20.)

      Gristede's attempts to fill openings for non-entry level positions by promoting from
within the company, and only "[v]ery rarely do[es the company] hire from the outside."  (Criscuolo
Dep. at 34:8-10; see also id. at 43; Puma Decl., Ex. J, Tr. of Dep. of Charles Criscuolo ("Criscuolo
Dep. (Def.)") at 46:20-48:5; McCormick Dep. at 33:10-34:15; Monos Dep. at 45:6-9.)  While the
procedure for promoting entry level employees to management positions is not as centralized as is
the hiring procedure, it is equally discretionary.  When a department manager position becomes
available at a store within his district, Christopher Lang, one of Gristede's two district managers
who oversee the individual store managers (see Criscuolo Dep. at 37:3-15; Lang Dep. at 19:2-20:6),
solicits recommendations of entry level employees from store managers (Lang Dep. at 55:2-58:3,
78:20-24, 84:10-23).  James Monos, the other district manager, simply passes store managers'
promotion recommendations along to McCormick and other managers.  (Monos Dep. at 44:3-12,
45:12-46:4, Puma Decl., Ex. L, Tr. of Dep. of James Monos ("Monos Dep. (Def.)") at 60:13-61:15,
64:15-65:21.)  Monos also discusses promotions with employees who raise the issue directly with

him.  (Monos Dep. at 49:5-19.)  The promotion recommendations eventually reach Criscuolo, who makes the ultimate decision about whether to make the recommended promotion.  (Lang Dep. at 100:22-24.)[1]

There are no written criteria for promotions of employees, and store managers, who often make the initial promotion recommendations, are not told of any such criteria.  (Greene Decl., Ex. 4, Tr. of Dep. of Faustino Ferdinand ("Ferdinand Dep.") at 70:19-71:4, 71:13-16.)  Employees are not told how to seek a promotion (see id. at 70:19-24 (stating that Ferdinand, a store manager, has "no idea" what an employee should do in order to get a promotion); Monos Dep. at 49:20-25; Monos Dep. (Def.) at 62:6-11, 63:20-64:13), and they often are not told when a management position is available (Criscuolo Dep. at 86:25-87:5; Greene Decl., Ex 8, Tr. of Dep. of Angelo Mendoza ("Mendoza Dep.") at 67:4-14; Greene Decl., Ex. 9, Tr. of Dep. of Sandi Molina ("Molina Dep.") at 107:2-23; Moore Dep. 72:21-24; Monos Dep. at 49:15-50:25; but see Ferdinand Dep. at 68:25-70:13).  One store manager evaluates an employee's "attendance, their personality and their ability for them to do the job that they have to do" in deciding whether to promote that employee (Mendoza Dep. at 60:13-20), as well as "a gut feeling" that the employee can perform the duties of the new position (id. at 62:4-7).

_____

[1]    Monos testified at his deposition that Michael McCormick makes final promotion decisions.  (Monos Dep. at 44:7-12.)  However, McCormick disavowed any involvement in promotion decisions, stating that he merely transmits the district managers' recommendations to Criscuolo, who makes the final determination.  (McCormick Dep. at 125:20-127:23.)  Thus, it appears from the record that store managers make recommendations to the district managers, who transmit them unreviewed to McCormick, who transmits them unreviewed to Criscuolo.  It is not clear by what criteria Criscuolo decides whether to act upon the recommendations; he suggested at his deposition that he simply accedes to the recommendations that are given to him, at least with respect to some management positions.  (See Criscuolo Dep. at 79:21-24, 93:12-95:17.)

Some management positions require specific experience.  (Criscuolo Dep. (Def.) at 111:22-112:11 (a dairy manager "should have working knowledge" of the dairy department); Monos Dep. (Def.) at 84:11-86:2 (deli, meat and grocery department managers must have experience in those departments).)  A department manager usually has been a clerk in that department.  (Monos Dep. (Def.) at 121:4-11; Mendoza Dep. (Def.) at 79:3-5.)  It is unusual for an entry-level employee to transfer into a different entry-level position.  (Mendoza Dep. (Def.) at 78:17-79:2.)  Potential promotees do not complete an application.  (Lang Dep. at 57; Monos Dep. at 50:2-11.)  There are no written job descriptions for department manger positions.  (McCormick Dep. at 68:9-11.)

Plaintiffs' witnesses have observed that most Gristede's cashiers are women and/or most clerks are men (see Greene Decl., Ex. 12, Decl. of Kizzy Bueford ("Bueford Decl.") ¶ 9; Greene Decl., Ex. 13, Decl. of Lewis Chewning ("Chewning Decl.") ¶ 6; Greene Decl., Ex. 14, Decl. of Adela Davila ("Davila Decl.") ¶¶ 3, 7; Duling Decl. ¶ 2;  Echevearria Decl. ¶¶ 3, 11; Gonzales Decl. ¶¶ 2, 7; Gonzalez Decl. ¶ 8;  Greene Decl., Ex. 19, Decl. of Angela Johns ("Johns Decl.") ¶¶ 3, 9;  McDonald Decl. ¶¶ 2, 8;  Ortiz Decl. ¶¶ 3, 9;  Greene Decl., Ex. 22, Decl. of Starliza Ramos ("Ramos Decl.") ¶¶ 3, 7;  Yashira Santiago Decl. ¶¶ 2, 7;  Yesenia Santiago Decl. ¶¶ 3, 11;  Greene Decl., Ex. 25, Decl. of Lakeya Sewer ("Sewer Decl.") ¶¶ 4, 11; Greene Decl., Ex. 26, Decl. of Ebony Singleton ("Singleton Decl.") ¶¶ 3, 9; Greene Decl., Ex. 33, EEOC Charge of Margaret Anderson ("Anderson EEOC Charge") ¶ 11); and assert that employees were not told about the existence of, or process for seeking, promotions from entry level positions, regardless of whether they expressed an interest in a promotion (see Bueford Decl. ¶ 10; Chewning Decl. ¶ 10; Davila Decl. ¶ 8; Duling Decl. ¶ 9;  Echevearria Decl. ¶¶ 9, 11, 12, 14; Gonzales Decl. ¶¶ 5-8; Gonzalez Decl. ¶ 9;  Johns Decl. ¶¶ 7, 10;  McDonald Decl. ¶¶ 9-12;  Ortiz Decl. ¶¶ 7, 10; Ramos

Decl. ¶¶ 4, 5, 8; Yashira Santiago Decl. ¶¶ 6, 8;  Yesenia Santiago Decl. ¶¶ 10, 12;  Sewer Decl. ¶¶

9, 12, 13; Anderson EEOC Charge ¶ 12).   Two of Plaintiffs' witnesses assert that women were

expressly disfavored for promotions (see Davila Decl. ¶ 4; Ramos Decl. ¶ 4).[2]

        Plaintiff Susan Duling has been employed by Gristede's as a part-time cashier since

approximately August 2003.  (Second Am. Compl. ¶¶ 82-83.)  Plaintiff Margaret Anderson was

employed by Gristede's as a part-time cashier from approximately November 2004 through

December 2004.  (Id. ¶¶ 89, 95.)  Gristede's records indicate that Anderson's employment was

terminated because she was "continually short on [her] register."  (Puma Decl., Ex. Q, Anderson

Termination Report.)  Plaintiff Lakeya Sewer was employed by Gristede's as a full time cashier from

approximately 2001 until February 2002, when she transferred to a receptionist position in Gristede's

corporate office.  (Id. ¶¶ 96-97.)  Duling, Anderson and Sewer contend that, at the time they were

hired, Gristede's steered them into cashier positions by refusing to consider their applications for

any other position.  (Id. ¶ 84, 92-94; Duling Dep. at 53:6-19; Puma Decl., Ex. H, Tr. of Dep. of

Margaret Anderson ("Anderson Dep.") at 33:2-25; Sewer Decl. ¶ 7; Puma Decl., Ex. V, Tr. of Dep.

of Lakeya Sewer ("Sewer Dep.") at 26:3-27:6.)  Duling wrote on her Gristede's application that she

was interested in a cashier position before speaking to anyone about the available positions (Puma

Decl., Ex. G, Tr. of Dep. of Susan Duling ("Duling Dep. (Def.)") at 50:7-13, 60:16-24; Puma Decl.,

Ex. B, Application for Employment of Susan Duling ("Duling App.")), but alleges that when she

delivered her completed application she asked about other positions and was told none were

available (Duling Dep. at 53:6-19).  Duling also alleges that, over the course of her tenure at

---

[2]      Defendants correctly note that many of the declarations submitted by Plaintiffs contain
boilerplate conclusory language.  The Court has focused on the aspects of the
declarations that contain specific factual allegations.

Gristede's, she has never been made aware of available management positions at Gristede's (Second Am. Compl. ¶¶ 85-86), despite her belief that she is qualified for such positions (id. ¶ 88). During that time Duling has received four "write-ups" for poor performance.  (Duling Dep. (Def.) at 88:2-16.)  Sewer alleges that she was told when she applied for Gristede's employment that the only position available at the time she applied was that of cashier, and that she did not ask to be placed in a different position.  (Sewer Decl. ¶ 7; Sewer Dep. at 26:3-27:6.)

Plaintiffs have also proffered reports from their expert witnesses William T. Bielby and David L. Crawford in support of their motion for class certification.  (Greene Decl., Ex. 28 ("Bielby Report"); Greene Decl., Ex. 29 ("Crawford Report").)[3]  Plaintiffs' expert reports purport to show that gender disparities exist in the hiring and promoting of Gristede's employees, and that those disparities are the result of the practices described above.  Using a "multiple pools exact test," which is "based on the computation of an exact probability" and "combines information for multiple groups (or multiple pools) to test for overall bias across several groups of employees" and which he describes as "a widely accepted method for computing statistical significance" (Crawford Report ¶ 15), Dr. Crawford calculated the probability that hiring and promotion decisions for 4,889 employees made by Gristede's during the period from 1999 to 2007 were gender neutral (id. ¶¶ 11, 15).  Dr. Crawford reported the results of his analysis in terms of standard deviations from projected gender-neutral results, noting that discrepancies of "2 or 3" standard deviations are generally considered statistically significant in litigation involving tests based on the normal distribution.  (Id. at ¶ 13-14.)  According to Dr. Crawford, "the probability that a discrepancy of 2

---

[3]     Plaintiffs also submit a report by Dr. Crawford in response to a report by Defendants' expert, Dr. June O'Neill, itself apparently responding to Dr. Crawford's initial report. (Greene Decl., Ex. 30 ("Crawford Rebuttal Report").)  Dr. O'Neill's report is not before the Court.

or more standard deviations would occur by chance is 4.55% . . . [and] the probability that a discrepancy of 3 or more standard deviations would occur by chance is 0.27% . . . ."  (Id. ¶ 14.)

Dr. Crawford determined that the initial placement of new hires into entry-level clerk positions significantly departed from gender-neutrality, with a difference of more than 6 standard deviations.  (Id. ¶¶ 22-23 (noting that 319 women were placed into clerk positions whereas a gender-neutral assignment would have placed 1038 women into clerk positions, and asserting that the probability that the actual assignments were made in a gender-neutral manner is essentially zero).)[4]  Similarly, Dr. Crawford found that the promotion of entry-level employees also departed from gender-neutrality by approximately 6.3 standard deviations.  Even when controlling for initial position, significantly fewer women were promoted than expected, resulting in a departure from gender-neutrality equivalent to a difference of approximately 4.9 standard deviations.  (Id. ¶¶ 12, 16, 18-19.)  Dr. Crawford opined that "[p]osition is not a legitimate control variable . . . because it is tainted by initial assignments that were not gender-neutral."  (Id. ¶ 24.)  Dr. Crawford also reported a discrepancy, equivalent to a difference of approximately 3.1 standard deviations, in the placement of new cashiers in part-time and full-time positions.  (Id. ¶ 26.)  He found the placements of new clerks in part-time and full-time positions consistent with gender-neutrality.  (Id. ¶ 27.)

Finally, Dr. Crawford analyzed wage disparities.  He found that, when controlling for length of tenure at Gristede's, gender differences ranged from 24.4% to 10.5% for each year during the period of time examined, with each year's disparity larger than seven standard

---

[4]     Dr. Crawford did not purport to account for applicants' preferences in initial placement.  Defendants contend, without any specific evidentiary proffer, that female applicants overwhelmingly request cashier positions.  Plaintiffs, as previously noted, contend that female applicants are steered toward such positions.  The parties dispute the quality and significance of preference-related information provided in discovery.

deviations.  (Id. ¶ 28.)  When controlling for position, which, as noted above, he believes is itself the product of a "tainted" initial placement process, the wage differences are not statistically significant.  (Id. ¶ 29.)  Dr. Crawford concludes that gender disparities in wages are due to disparities in ultimate job position.  (Id. ¶ 30.)[5]  Dr. Crawford similarly found that "merit increases," which are discretionary pay increases, are awarded in a non-gender-neutral manner, in that women were awarded fewer such increases than expected, and the disparity was equivalent to approximately 2.2 standard deviations. (Crawford Report ¶ 31.)  However, as with the wage disparity, the disparity in merit increases disappears when one controls for position, and women even receive "a disproportionately large share of merit increases" under such an analysis.  (Id. ¶ 32.)  This last result is not informative, according to Dr. Crawford, because job position "is tainted by past departures from gender-neutrality" and is thus not a legitimate control variable.  (Id.)

Dr. Bielby, relying on the Crawford Report, Gristede's job placement and promotion practices, and social science research, opined as to the potential causes of the discrepancies described in the Crawford Report.  Dr. Bielby reviewed social science literature showing that "occupations and jobs with highly skewed ratios of men to women become *sex labeled* – widely viewed as 'men's work'" (Bielby Report ¶ 23 (emphasis in original)), that sex labeling reinforces gender-based disparities by contributing to a "gender-based schema" of the job (id.), and that such schemas tend to solidify over time (id. ¶ 24).

Dr. Bielby's report also discusses social science research demonstrating that "substantial discretion in assessing and weighing evaluative criteria [for employment] invites bias"

---

[5]    In accordance with a collective bargaining agreement, clerks and cashiers receive identical beginning wages and wage increases.  (Puma Decl., Ex. I, Tr. of Dep. of Deborah Clusan ("Clusan Dep. (Def.)") at 79:5-17; Criscuolo Dep. (Def.) at 64:24-65:6.)

(id. ¶ 25), and that "discretion in the definition and weighing of evaluative criteria, even with

regard to ostensibly objective criteria, contributes to bias, and . . . often does so in a way that allows

decision-makers to justify to themselves and to others that their actions are fair and

nondiscriminatory" (id. ¶ 26).[6]  Bias resulting from such discretion is largely due, according to Dr.

Bielby's report, to the influence of gender stereotypes, which are "socially shared beliefs about the

characteristics or attributes of men and women in general that influence our perception of

individual men and women."  (Id. ¶ 27 (internal quotation and citation omitted).)

Dr. Bielby proffers that the influence of gender stereotypes can sometimes be

curtailed (id. ¶ 28-33), but only when "human resources practices are formalized so that decision-

makers know that they will be held accountable for the criteria used to make decisions, for the

accuracy of the information upon which the decisions are based, and for the consequences their

actions have for equal employment opportunity" (id. ¶ 31).  Formal written policies are insufficient

to minimize bias if they are merely "passive" or symbolic.  (Id. ¶ 32.)  Instead, Dr. Bielby opines,

bias reduction requires "proactive policies and practices, including recurring and mandatory

training of managers and supervisors, and systematic and consistent monitoring of outcomes of

personnel decisions," as well as "explicit evaluation of managers and supervisors on their

contributions to an organization's equal opportunity goals."  (Id. ¶ 33.)  Dr. Bielby also pointed to

"[a] large body of research in sociology and organizational studies, dating back to the 1950s,"

showing that employees with fewer opportunities for advancement tend to lower their ambitions

and commitment to their work as compared to others with more opportunities.  (Id. ¶ 40.)

Dr. Bielby noted that "Gristede's provides very little guidance to its managers about

---

[6]      Like Dr. Crawford, Dr. Bielby did not purport to account for applicants' preferences
in initial placement.

the criteria to be used in making decisions about hiring, job assignment, and promotion," and characterized the "qualifications and criteria" used in making those decisions as "highly subjective." (Id. ¶ 34.) He asserted that "Gristede's nondiscrimination and equal employment opportunity policies are virtually nonexistent." (Id. ¶ 48.) Dr. Bielby also noted Gristede's failure to make any "systematic efforts to learn which employees are interested and qualified for promotions" (id. ¶ 39), that employees are not informed about promotion requirements (id.), and that employees learn of open positions primarily by word of mouth (id. ¶ 41). When information about job opportunities is disseminated in this manner, says Dr. Bielby, "opportunities for advancement tend to be more accessible to advantaged groups in the workplace – 'insiders,'" namely men. (Id. ¶ 42.)

Dr. Bielby opined that Gristede's does not even have ineffective passive, or symbolic, nondiscrimination policies, but rather that it has no such policies at all. (Id. ¶ 48.) Dr. Bielby concluded that Gristede's inadequate nondiscrimination policies, its failure to monitor personnel decisions, and its highly subjective criteria for making such decisions "creates and sustains a highly segregated workforce and gender disparities in promotion rates." (Id. ¶ 50.)

Plaintiffs' proposed class consists of "all current and former female Gristede's employees who worked for Gristede's at any time between November 2, 2004 and the date of final judgment in this matter." (Pls.' Br. 1.)[7]

---

[7]       Defendants contest the scope of the class period on the ground that Anderson's EEOC charge cannot support promotion claims in light of Anderson's brief tenure at Gristede's. (Defs' Br. 8, n.4.) However, Anderson's September 2, 2005, EEOC charge supports all class claims because they are "reasonably related" to the claims in that charge. The question is whether "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Velez v. Novartis Pharmaceuticals Corp., 244 F.R.D. 243, 255 (S.D.N.Y. 2007) (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d

D<small>ISCUSSION</small>

*Defendants' Motions to Strike Plaintiffs' Expert Reports*

Defendants move, pursuant to Rule 702 of the Federal Rules of Evidence, to strike

the expert reports of William T. Bielby and David L. Crawford, both of which were submitted by

Plaintiffs in support of their motion for class certification.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The proponent of an expert's testimony bears the burden of establishing its

admissibility by a preponderance of the evidence.  <u>Figueroa v. Boston Sci. Corp.</u>, 254 F. Supp. 2d

361, 366 (S.D.N.Y. 2003).  "The Federal Rules of Evidence assign to [the Court] 'the task of

ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at

hand.'"  <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007) (quoting <u>Daubert v. Merrell</u>

<u>Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993)).  The Court has "broad latitude" in deciding both

"how to determine reliability" and in reaching "its ultimate reliability determination," but it may

not abandon its gatekeeping function.  <u>Id.</u> at 160-61 (internal quotation marks and citations

---

Cir. 2001)).  The <u>Holtz</u> court "approvingly noted a district court's conclusion that 'it would have been reasonable to suspect that the EEOC, in investigating [a] complaint of failure to train because of age, would have assessed [the corporation's] promotion and transfer policies.'" <u>Velez</u>, 244 F.R.D. at 256 (quoting <u>Holtz</u>, 258 F.3d at 84) (alterations in original).  Similarly, it would have been reasonable to suspect that the EEOC, in investigating Anderson's discrimination claims relating to initial job placement, would have assessed Gristede's promotion policies and practices.  This is especially true in light of the allegations in Anderson's EEOC charge that Gristede's promotion practices also discriminate against women.

omitted).

The Crawford and Bielby Reports easily satisfy the requirements of Rule 702. Defendants' arguments, made in legal memoranda but not supported by expert or other evidence, challenge various aspects of the experts' procedures in conducting their statistical evaluations, including the time frame used, the alleged failure to control for certain variables, and the failure to consider certain alleged facts. The validity of Plaintiffs' experts' conclusions is not vitiated by the consideration of data outside of the class period, National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (such data may constitute "background evidence in support of a timely claim"); there is no evidence in the current record of material changes in Gristede's practices over the class period or the longer period. The challenged aspects of the methodology are apparent on the face of the reports, thus permitting a fact finder to evaluate the impact and weight of the alleged flaws. Furthermore, there is evidence in the record that, if believed, would support a finding of deliberate sex-segregation of the workforce from hiring onward. On this record, Plaintiffs have demonstrated sufficiently the reliability of the underlying data and the methodologies employed by the experts to satisfy the requirements of Rule 702. Defendants' arguments are relevant, if at all, to the weight that should be given to the reports. The Court concludes that both reports plainly employ reliable and well accepted methods and adequately apply them to sufficient data in order to render the conclusions reliable.

Plaintiffs' expert reports also satisfy the relevance requirement of Rule 702. The Crawford Report provides evidence that, with the other evidence of record concerning initial hiring and promotions in a sex-segregated workforce, would tend to make more probable Plaintiffs' disparate treatment hypotheses. As to the Bielby Report, which offers no new data but makes social-science based observations relating to sex-stereotyping as an underlying mechanism that, if

not actively checked, could explain the impact of Gristede's hiring and promotion practices, the

sources cited and methodology employed are sufficiently well explained for Rule 702 purposes and

the report is relevant to the disparate treatment and disparate impact claims.

Finally, the Court finds that Dr. Crawford's and Dr. Bielby's qualifications suffice to

establish their expertise in the fields of statistics and sociology, respectively, as required by Rule

702.  Accordingly, Defendants' motions to strike the reports are denied.

*Class Certification Motion*

Rule 23 of the Federal Rules of Civil Procedure governs the certification of an

action as a class action.  First, Rule 23(a) requires Plaintiffs to show: (1) that the class is so

numerous that joinder of all members is impracticable ("numerosity"); (2) that there are questions

of law or fact common to the class ("commonality"); (3) that the claims or defenses of the

representative parties are typical of the claims or defenses of the class ("typicality"); and (4) that the

representative parties will fairly and adequately protect the interests of the class ("adequacy").  Fed.

R. Civ. P. 23(a).  Second, Plaintiffs must show that the action is of one of the three types listed in

Rule 23(b).  Plaintiffs' motion seeks class certification on the basis of Rule 23(b)(2), which applies

when "the party opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the

class as a whole."  Fed. R. Civ. P. 23(b)(2).[8]

A class action "'may only be certified if the trial court is satisfied, after a rigorous

analysis, that the prerequisites'" of Rule 23 are met.  In re Initial Pub. Offering Secs. Litig. ("In re

---

[8]     The Second Amended Complaint also invokes Rule 23(b)(3), but Plaintiffs have not
requested Rule 23(b)(3) certification in this motion practice.  (Second Am. Compl. ¶
60).

IPO"), 471 F.3d 24, 33 (2d Cir. 2006) (quoting General Telephone Co. of the Southwest v. Falcon,

457 U.S. 174, 161 (1982)).  "[T]he requirements of Rule 23 must be met, not just supported by

some evidence."  Id.; see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,

546 F.3d 196, 202 (2d Cir. 2008) (holding that "the preponderance of the evidence standard applies

to evidence proffered to establish Rule 23's requirements"); cf. In re IPO, 471 F.3d 24 (rejecting

lower "some showing" standard).  The burden on Plaintiffs to prove satisfaction of the Rule 23

requirements is not reduced by the overlap of those requirements with the merits of Plaintiffs'

claims.  Id. at 41 ("there is no reason to lessen a district court's obligation to make a determination

that every Rule 23 requirement is met before certifying a class just because of some or even full

overlap of that requirement with a merits issue").

       While it remains true that there is "nothing in either the language or history of Rule

23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order

to determine whether it may be maintained as a class action," Eisen v. Carlisle & Jacquelin, 417

U.S. 156, 177 (1974), such an inquiry is appropriate where the class certification determination

incidentally overlaps with merits, In re IPO, 471 F.3d at 33 (explaining that the merits inquiry

reproved in Eisen was gratuitous and "had nothing to do with determining the requirements for

class certification").  Thus, the Court must make a "definitive assessment" based on the

"resol[ution of] factual disputes relevant to each Rule 23 requirement and [a] find[ing] that

whatever underlying facts are relevant to a particular Rule 23 requirement have been established"

while avoiding the "assess[ment of] any aspect of the merits unrelated to a Rule 23 requirement."

Id. at 41.

       The Court has made just such a thorough and rigorous definitive assessment with

respect to each of the Rule 23(a) factors and Plaintiffs' contention that certification pursuant to

Rule 23(b)(2) is appropriate.

          Rule 23(a) Factors

Numerosity

          Defendants do not contest that the proposed class, which Plaintiffs contend consists of "at least 668 women," meets the numerosity requirement.  (Pls.' Br. 17.)  Because "numerosity is presumed at a level of 40 members," the Court concludes that the Plaintiffs' proposed class is sufficiently numerous to satisfy Rule 23(a)(1).  Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

Commonality and Typicality

          The commonality and typicality requirements "'tend to merge' because '[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'"  Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999) (alterations in original) (quoting Falcon, 457 U.S. at 157 n.13 (1982)); see also Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997).  "To determine commonality, it is not necessary to decide whether plaintiffs' evidence is ultimately compelling" as to the merits of their claims.  Velez, 244 F.R.D. at 257.  "Commonality requires that plaintiffs present common *questions* of fact or law; plaintiffs' ultimate success at trial on the merits requires an *answer* to that question, specifically that defendants actually did discriminate against plaintiffs."  Id. (emphasis in original) (quoting Hnot v. Willis Group Holdings Ltd., 241 F.R.D. 204, 211 (S.D.N.Y. 2007)).  "Even a single common legal or factual question will suffice" to satisfy the commonality requirement as to a particular claim.  In re NYSE Specialists Sec. Litig. ("In re NYSE"), No. 03 Civ. 8264 (RWS), 2009 WL 1683349, at *14 (S.D.N.Y. June 5, 2009) (quoting Freeland v. AT&T Corp., 238 F.R.D. 130, 140 (S.D.N.Y.

2006)).

Similarly, the typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001) (quoting Marisol A., 126 F.3d at 376). The purpose of this requirement is "to ensure that a class representative has 'the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'" In re NYSE, 2009 WL 1683349, at *15 (quoting In re NASDAQ Market-Makers Antitrust Litig., 172 F.R.D. 119, 126 (S.D.N.Y. 1997)).

Typicality is absent where the named plaintiffs are "'subject to unique defenses which threaten to become the focus of the litigation.'" Id. (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000)). "'The unique defense rule, however, is not rigidly applied in this Circuit,' and is 'intended to protect [the] plaintiff class – not to shield defendants from a potentially meritorious suit.'" Id. (quoting In re Parmalat Sec. Litig., No. 04 MD 1653 (LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008)); see also Caridad, 191 F.3d at 293 (the typicality requirement "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class"); Velez, 244 F.R.D. at 268 ("As long as plaintiffs assert . . . that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish the necessary typicality." (internal quotation marks and alteration omitted)). Thus, the commonality and typicality requirements, together, require Plaintiffs to show that they raise questions of fact or law, arising out of a single course of conduct or set of events, that are

common to all putative class members and that their individual claims and circumstances are

sufficiently similar to those of the absent class members so as to ensure that the named plaintiffs

will press the claims of all class members.

          Plaintiffs assert both disparate treatment and disparate impact discrimination claims.

When such claims "focus on allegations of widespread acts of intentional discrimination against

individuals," as they do here, plaintiffs typically seek to establish a prima facie case by producing

"two kinds of circumstantial evidence . . . (1) statistical evidence aimed at establishing the

defendant's past treatment of the protected group, and (2) testimony from protected class members

detailing specific instances of discrimination." Robinson, 267 F.3d at 158. Disparate impact

claims challenge policies or practices that are neutral on their face but have a disparate effect on the

protected group. To make their prima facie case on their disparate impact claims, Plaintiffs "must

(1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal

relationship between the two." Id. at 160 (citing Byrnie v. Town of Cromwell, Bd. of Educ., 243

F.3d 93, 111 (2d Cir. 2001)).

          Plaintiffs' claims are of injury and ongoing violations arising from company-wide

policies and practices rather than one-on-one specific decisions or acts of discrimination. Plaintiffs

have proven by a preponderance of the evidence that common questions exist, through their

evidence of steering or channeling practices at the initial hiring stage, lack of hiring and promotion

standards having the purpose or effect of protecting against intentional or unintentional sex

discrimination, and data showing statistically significant disparities in hiring into job categories and

in promotion and resulting compensation rates. The Court cautions that it does not address the

overlapping question of whether Plaintiffs have demonstrated that they can prevail on the merits of

any of their claims, but determines merely that Plaintiffs have met their burden of demonstrating

that there are core questions that are common to the claims asserted, such that the commonality requirement is satisfied.

Defendants argue that Duling's voluntary indication of interest in a cashier position and her allegedly poor job performance, in that she received four "write-ups," and Anderson's tenure at Gristede's having been too brief for her to have been eligible, and thus denied the opportunity, for a promotion, subject the named Plaintiffs to unique defenses that render them atypical of the class. Arguing that the named plaintiffs' circumstances are unique "is, of course, always the defendant's contention in class action discrimination claims," but "claiming that something other than discrimination explains the named plaintiffs' experience" is insufficient to defeat typicality because "[t]he question presented by each plaintiff's claim is undoubtedly typical of the class, whether or not defendants are eventually able to prove that the answer to that question is unique to each plaintiff." Velez, 244 F.R.D. at 268.  The individual circumstances on which Defendants base this argument relate to the named Plaintiffs' ability to prove their specific claims of injury, but do not bear upon whether Plaintiffs have raised common questions of law or fact as to Gristede's employment policies and practices.  "A difference in the amount of damages arising from differing degrees of injury does not preclude either commonality or typicality." Vengurlekar v. HSBC Bank, No. 03 Civ. 243 (LTS), 2007 WL 1498326, at *6 (S.D.N.Y. May 22, 2007).

Furthermore, "the fact that the Class Plaintiffs challenge the subjective components of company-wide employment practices does not bar a finding of commonality under either the disparate treatment or disparate impact model." Caridad, 191 F.3d at 292.  The Supreme Court has recognized that intentional discrimination claims are susceptible to class action suits where "the discrimination manifested itself . . . through entirely subjective decisionmaking processes." Falcon, 457 U.S. at 159 n.15.  "And, it is beyond dispute that the disparate impact analysis may be applied

to subjective, as well as objective, employment practices."  Caridad, 191 F.3d at 292 (stating

further that "[w]e see no reason to limit this principle to individual claims of disparate impact," as

opposed to class-wide claims).

        In order to demonstrate that their claims challenging Defendants' subjective

decision-making practices satisfy the commonality and typicality criteria, Plaintiffs must show "that

the challenged practice is causally related to a pattern of disparate treatment or has a disparate

impact."  Velez, 244 F.R.D. at 258 (quoting Caridad, 191 F.3d at 292).  In support of their claims,

Plaintiffs have submitted deposition testimony from Gristede's high-level managers tending to

show that all hiring decisions are made by five male individuals, in their sole discretion, are

unguided by any policies or criteria, and are not reviewed by anyone else.

        Plaintiffs have offered numerous accounts of female applicants being steered or

directed to cashier positions.  Plaintiffs have also submitted an expert report indicating a significant

gender discrepancy in the initial placement of newly hired employees, in that women are far more

likely than men to be placed into cashier positions.  Similarly, Plaintiffs have submitted testimony

from various Gristede's managers demonstrating that manager positions are usually filled by

promoting from within the company, and that the selection of employees for promotion is based

primarily on the recommendations of store managers.  Gristede's has no policy or criteria, and store

managers are not otherwise given any guidance, regarding the qualifications required for any of the

various manager positions.  Thus, the promotion decisions, like the initial hiring decisions, are left

to the discretion and subjective preferences of the managers in charge of making those decision.

        As with the placement of initial hires, Plaintiffs' experts' reports show that women

are disproportionately less likely than men to be selected for promotion, and in particular that

cashiers are disproportionately unlikely to be promoted.  In addition, Plaintiffs proffer the

deposition testimony of several managers who confirm that they received no direction from their superiors as to selecting employees to recommend for promotion, have promoted few or no women, or are disinclined to promote cashiers.  This anecdotal evidence appears to be consistent with Plaintiffs' expert and statistical evidence regarding the relevant practices and their effects.

Plaintiffs' evidentiary submissions are sufficient to demonstrate, by the requisite preponderance of the evidence, that there are multiple questions that are common to the proposed class and that are susceptible to class-wide resolution, including: whether Defendants' hiring and job placement practices are discretionary and based on subjective judgments; whether female entry-level employees were disproportionately placed into cashier positions as a result of those job placement practices; whether, and to what extent, intentional gender bias is a component of the subjective exercise of the discretionary hiring and initial placement decisions; whether Defendants' promotion practices are discretionary and based on subjective judgments; whether female entry-level employees were disproportionately passed over for promotion as a result of those promotion practices; and whether, and to what extent, intentional gender bias is a component of the discretionary promotion decisions.  At least some of these questions are relevant to each of the named Plaintiffs' individual claims, establishing that they meet the typicality requirement.

The evidence submitted by Defendants does not contradict Plaintiffs' characterizations of Gristede's relevant personnel practices as discretionary and subjective, nor does it undermine the relevance of the expert reports.  Rather, Defendants endeavor to show that Gristede's managers exercise their discretion appropriately, and that the named Plaintiffs and several other potential class members did not qualify for positions they claim they were denied discriminatorily.  These are merits-related questions that the Court need not, and should not, resolve at this stage.  These issues do not vitiate the presence of common questions applicable to all

class members.

To be sure, there are also individual questions, such as whether each class member was qualified for a particular position or promotion. However, the presence of such individual questions does not preclude class certification with respect to the liability and injunctive relief aspects of Plaintiffs' pattern or practice disparate treatment, and disparate impact, claims relating to Defendants' hiring, promotion and compensation practices.

Adequacy

Rule 23(a)(4) of the Federal Rules of Civil Procedure requires that "the representative parties [demonstrate that they] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (internal quotation marks and citations omitted). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006) (citing Baffa, 222 F.3d at 60; Robinson, 267 F.3d at 170). As a part of its inquiry, the Court must determine whether Plaintiffs' attorneys "are qualified, experienced and able to conduct the litigation." Baffa, 222 F.3d at 60.

As they did with respect to the typicality requirement, Defendants argue that Duling's voluntary selection of the cashier position on her application and the brevity of Anderson's tenure at Gristede's make those plaintiffs atypical, and therefore inadequate, class representatives. As explained above, this argument fails. Furthermore, the fact that representatives are no longer employed by Gristede's does not make them inadequate, as the relief they seek includes injunctive relief that would open avenues to a greater range of entry level jobs and prospects for promotion

should they decide to return to work for Gristede's.

        The interests of the proposed class representatives, Duling, Anderson and Sewer, are well aligned with those of the absent class members.  There are no conflicts of interest, and certainly no "fundamental" conflicts, see Denney, 443 F.3d at 268 (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001)), between the representatives and the other class members, and Defendants do not suggest otherwise.  Similarly, the Court is persuaded, and Defendants do not dispute, that Plaintiffs' counsel are experienced and well qualified to conduct the instant litigation.  (See Declaration of Adam T. Klein ¶¶ 20-26 (discussing counsel's and Plaintiffs' adequacy, and describing nine other class actions prosecuted by Plaintiffs' counsel's firm in various courts).)  The Court therefore finds that Plaintiffs satisfy the adequacy requirement of Rule 23(a)(4).

        Rule 23(b)(2)

        Rule 23(b)(2) of the Federal Rules of Civil Procedure permits the certification of a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Court may grant 23(b)(2) certification if it determines that "(1) the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy."  Robinson, 267 F.3d at 164 (internal quotation marks, citation, and alteration omitted).

        Plaintiffs seek several forms of relief, including declarations that Defendants have violated the law and discriminated against the class on the basis of gender, a permanent injunction, a judgment directing Defendants to institute policies and practices that eliminate gender disparities in

employment opportunities and "eradicate the effect of [their] past and present" practices and to implement "objective standards" for making employment decisions, appointment of a monitor to ensure compliance with any injunctive provisions of the judgment, and an award of "all damages sustained as a result" of Defendants' conduct and punitive damages.  Among the damages potentially available to Plaintiffs should they succeed, are back pay and front pay, which are individualized equitable forms of relief.  See Robinson, 267 F.3d at 160.  Plaintiffs request the certification of a Rule 23(b)(2) class with respect to all of their injunctive and equitable relief claims, including remedial pay, and that the court direct the provision of individualized notice of the action and an opportunity to opt-out of the litigation as well.

In order for the injunctive or declaratory relief to predominate, the Court must conclude, at minimum, that (1) "reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought," and (2) such relief "would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits."  Id. at 164.  The nature of the harm that Plaintiffs allege – namely, that Defendants' employment policies and practices deprive them of opportunities to obtain certain positions and better pay – lends itself to injunctive and declaratory prospective relief, and the Court is therefore satisfied that the injunctive and declaratory relief sought is predominant and would be sought by reasonable plaintiffs.  See Velez 244 F.R.D. at 271 (certifying a Rule 23(b)(2) liability class, reasoning that "it would serve little purpose to award money damages for discrimination without addressing the institutional structure that perpetuates it").

It may be that back- and front-pay determinations, and monetary damages calculations, for individual class members may not be as amenable to class-based determination, particularly in light of individualized performance, job selection and similar issues.  Rule 23(c)(4) permits the certification of class actions with respect to particular issues.  Here, the court finds that

class treatment is appropriate in so far as Plaintiffs allege, and seek injunctive and declaratory relief in respect of, pattern or practice disparate treatment and the disparate impact of Gristede's alleged company-wide hiring, promotion and compensation practices. The Court denies the certification motion without prejudice to the extent it seeks certification of the front pay, back pay or money damages aspects of Plaintiff's claim, and to the extent it seeks the provision of individualized notice at this juncture.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motions to strike the expert reports of William T. Bielby and David L. Crawford, and grants Plaintiffs' motion to certify, pursuant to Fed. R. Civ. P. 23(b)(2), a class consisting of "all current and former female Gristede's employees who worked for Gristede's at any time between November 2, 2004 and the date of final judgment in this matter" with respect to Plaintiffs' claims for injunctive and declaratory relief based on Defendants' alleged systemic pattern or practice intentional discrimination, and the allegedly disparate impact of Defendants' hiring, promotion and compensation policies. Plaintiffs' motion for class certification is denied without prejudice in all other respects. The parties are directed to proceed in accordance with Judge Pitman's Order of March 19, 2009. (Docket entry no. 93.)

This Opinion and Order resolves docket entry nos. 69, 77, and 82.

SO ORDERED.

Dated: New York, New York
       March 8, 2010

LAURA TAYLOR SWAIN
United States District Judge